UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RIVA JANES, BRUCE SCHWARTZ, BETTE GOLDSTEIN, and HILLEL ABRAHAM individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>         v.<br><br>TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, JAY H. WALDER, as Chairman and Chief Executive Officer of the Metropolitan Transportation Authority, and JAMES FERRARA, as President of the Triborough Bridge and Tunnel Authority,<br><br>              Defendants. | No. 06-cv-1427 (PAE) (HBP)<br><br>ECF Case |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Jeffrey A. Klafter<br>Seth R. Lesser<br>KLAFTER OLSEN & LESSER LLP<br>Two International Drive, Suite 350<br>Rye Brook, New York 10573<br>Tel: (914) 934-9200<br>Fax: (914) 934-9220 | Harley J. Schnall<br>LAW OFFICE OF HARLEY J. SCHNALL<br>711 West End Avenue<br>New York, New York 10025<br>Tel: (212) 678-6546 |

*Attorneys for Plaintiffs and the Class*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………………1

STATEMENT OF FACTS…………………………………………………………………..2

ARGUMENT……………………………………………………………………...5

    I.     Standard of Review……………………………………………….................5

    II.    The TBTA Toll Structure Violates the Constitutional Rights to Travel and/or the Comity Clause of Article IV and/or the Equal Protection Clause and/or the Privilege or Immunities Clause of the Fourteenth Amendment…...…………….…..6

          A.    The Right to Travel Claims Fall Squarely Within the Equal and Non-Discriminatory Right to Travel *Qua* Travel Protected by the Constitution……………………………………………………………..6

          B.    The TBTA's *Selevan II* and *III* and "Minimal Burden" Defenses All Fail………………………………………………………………..15

    III.    The TBTA Toll Schemes Violate the Right to Travel/Right to Pursue a Trade Protected by the Comity Clause………………………………………………20

    IV.    The TBTA's Toll Structure Violates the Dormant Commerce Clause…………..21

CONCLUSION……………………………………………………………………..30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*American Trucking Ass'ns v. Michigan PSC*, 545 U.S. 429 (2005)............................................... 28

*Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986)…………………………..8, 9, 13

*Austin v. New Hampshire*, 420 U.S. 656 (1975) ........................................................................ 10

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984)………………………………………..24, 29

*Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371 (1978) .................................. 8, 20

*Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511 (1935)………………………………………..24, 27

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ............................................... 12

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573 (1986).............. 25

*C&A Carbone Inc., v. Town of Clarkstown, New York*, 511 U.S. 383 (1994)...................... *passim*

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564 (1997)….22, 25, 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 6

*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432 (1985)………………………………….14

*City of New York v. State of New York*, 94 N.Y.2d 577 (2000)………………………………1, 28

*Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439 (D.R.I. 2011) ...................................... 16

*Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977)....................................................... 28

*Corfield v. Coryell*, 4 Wash. C. C. 371, 6 F. Cas. 546 (No. 3, 230) (C.C.E.D. Pa. 1825)..... *passim*

*Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1868)………………………………...........................7, 9

*Dean Milk Co. v. Madison*, 340 U.S. 349 (1951) ....................................................................... 23

*Dunn v. Blumstein*, 405 U.S. 330 (1972)………………………………………………….8, 9

*Edwards v. California*, 314 U.S. 160 (1941) ...................................................................... *passim*

*Evansville Airport v. Delta Airlines, Inc.,* 405 U.S. 707 (1972) .......................................... *passim*

*Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Res.*, 504 U.S. 353 (1992) .... 23

*Gibbons v. Ogden*, 22 U.S. (1 Wheat.) 1 (1824)................................................................. 14, 22

*Gray v. Cook*, 8 Del. (3 Houst.) 49 (1864) ............................................................................ 10

*H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949).................................................. 25, 27

*Hicklin v. Orbeck*, 437 U.S. 518 (1978) ....................................................... 14, 20, 21

*Hughes v. Oklahoma*, 441 U.S. 322 (1979)……………………………………………………….6

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977) .................................. 6, 25

*Kansas v. United States*, 16 F.3d 436 (D.C. Cir. 1994) ............................................................. 17

*Kelen v. Mass. Tpk. Auth.*, 2007 Mass. Super. LEXIS 262 (Mass. Super. Ct. May 3, 2007)....... 16

*Kent v. Dulles*, 347 U.S. 116 (1958) ......................................................................................... 9

*Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287 (1998) ............................................ 28

*Maine v. Taylor*, 477 U.S. 131 (1986)………………………………………………………….6

*McBurney v. Young*,  133 S. Ct. 1709 (2013) .............................................................................. 8

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).................................................................. 12

*Mem'l Hosp. v. Maricopa County*, 415 U.S. 250 (1974) ........................................................ 8, 9

*Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1984)…………………………………………14, 24, 26

*Miller v. Reed,* 176 F.3d 1202 (9th Cir. 1999).......................................................................... 17

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)........................................................ 27

*Northwest Airlines v. County of Kent,* 510 U.S. 355 (1993)................................................. *passim*

*Oregon v. Mitchell*, 400 U.S. 112 (1970) .................................................................................. 9

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93 (1994).....12,17, 18, 22

*Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1869).......................................................... 9, 11, 12, 15

*Philadelphia v. New Jersey*, 437 U.S. 617 (1978) ...................................................................... 24

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ........................................................................ 26

*Plyler v. Doe*, 457 U.S. 202 (1982)………………………………………………………………13

*Saenz v. Roe*, 526 U.S. 489 (1999)……………………………………………………*passim*

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009)………………………………..*passim*

*Selevan v. N.Y. Thruway Auth.*, 2011 U.S. Dist. LEXIS 136068
   (W.D.N.Y. Nov. 28, 2011)………………………………………………………………...15, 18

*Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253 (2d Cir. 2013)…………………………………*passim*

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ........................................................................ 8, 9, 14

*Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985)........................................ 18, 21

*Surprenant v. Mass. Tpk. Auth.*, 2010 U.S. Dist. LEXIS 19060 (D. Mass. Mar. 4, 2010)............16

*The Passenger Cases,* 48 U.S. (7 How.) 283 (1849)……………………………….…………7, 9, 15

*Toomer v. Witsell*, 334 U.S. 385 (1948) ............................................................................. 12, 21

*Town of Southold v. Town of East Hampton,* 477 F.3d 38 (2d Cir. 2007)................................... 17

*Travis v. Yale & Towne Mfg.*, 252 U.S. 60 (1920) .............................................................. 27, 28

*United Bldg. & Constr. Trades of Camden County & Vicinity v. Camden*, 465 U.S. 208
   (1984).......................................................................................................................... 1, 21

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330
   (2007)………………………………………………………………………….........6, 29

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245
   (2d Cir. 2001)…………………………………………………………………………...6

*United States v. Guest*, 383 U.S. 745 (1966) ............................................................................. 11

*Veazie v. Moor*, 55 U.S. (1 Ho.) 568 (1853)......................................................................... 14, 22

*W. Lynn Creamery v. Healy*, 512 U.S 186 (1994)……………………………………..17, 24, 29

*Ward v. Maryland*, 79 U.S. (12 Wall.) 418 (1871)..................................................................... 20

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ................................................................ 23, 24, 25

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycles, Inc.*, 401 F.3d 560 (4th Cir. 2005) ............. 26

*Zobel v. Williams,* 457 U.S. 55 (1982) ........................................................................ 13

## Constitutional Provisions

N.Y. CONST. art. I, § 11 ............................................................................................. 1

U.S. CONST. amend. XIV, § 1 ............................................................... *passim*

U.S. CONST. art. I, § 8, cl. 3 ............................................................... *passim*

U.S. CONST. art. IV, § 2, cl. 1 ............................................................... *passim*

## Rules

FED. R. CIV. P. 56(a)………………………………………………………………5

## Other Authorities

Dan T. Coenen, *State User Fees and the Dormant Commerce Clause*,
    50 VAND. L. REV. 795 (1997) ............................................................... 16, 17

Kurt T. Lash, *The Origins of the Privileges and Immunities Clause, Part I: "Privileges
    and Immunities" as an Antebellum Term of Art*, 98 GEO. L. J. 1241 (2010) ........................... 10

Robert G. Natelson, *The Original Meaning of the Privileges and Immunities Clause*,
    43 GA. L. REV. 1117 (2009) ............................................................... 10

## PRELIMINARY STATEMENT

At issue in this case is the constitutionality of residency-based discounts for the
Verrazano-Narrows, Cross Bay Veterans Memorial, and the Marine Parkway Gil Hodges
Memorial bridges that are solely made available to residents of certain geographic areas of New
York State pursuant to programs imposed by the State Legislature and over the objections of
Defendants (referred to herein as "TBTA."). The claims asserted by the named Plaintiffs and the
Class certified for injunctive purposes, *see* Dkt. No. 68, are that the programs violate art. I, § 8,
cl. 3 ("the Commerce Clause"), art. IV, § 2, cl. 1 ("the Privileges and Immunities Clause" or the
"Comity Clause"),[1] amend. XIV, § 1, cl. 2 ("the Privileges or Immunities Clause"), and amend.
XIV, § 1 ("the Equal Protection Clause") of the United States Constitution, and art. I, § 11 of the
New York State Constitution. Amended Complaint (Dkt. No. 38).

The TBTA (now defending what the Legislature imposed on it) has moved for summary
judgment because, in short, it contends that the tolls charged to all out-of-staters and to the non-
preferentially treated New Yorkers are essentially fair and reasonable because they are a fair
price to be paid for the use of the bridges at issue – in effect, the tolls are separate and unequal
but acceptable, so long as they are not excessive in relation to the benefits provided to those who
have to pay more. But there is a metaphorical "elephant in the room" attempted to be ignored in

---

[1] Unlike the other claims being asserted, the Comity Clause claims are not asserted on behalf of
those Class members who are New York residents because in-state residents who suffer
discrimination at the hands of their own State may not assert an Article IV claim since "they
have a chance to remedy at the polls any discrimination against them." *United Bldg. & Constr.
Trades of Camden County & Vicinity v. Camden*, 465 U.S. 208, 217 (1984). The other claims
are asserted on behalf of all Plaintiffs and the Class. This brief does not otherwise address the
New York State law claims because they are derivative of the federal claims with one exception:
in *City of New York v. State of New York*, 94 N.Y.2d 577 (2000) (discussed at page 28 & n.18,
below), the New York Court of Appeals found a discriminatory commuter tax scheme
impermissible under the federal Constitution – which this Court may not – and did not reach the
New York Constitution question and could possibly reach a different result under New York law
here.

the TBTA's brief – the fact that the toll structures are all based upon the imposition of differing beneficial rates for some citizens of New York as opposed to citizens of any of the other states of the Union.  It is perhaps with a sense of irony that its document setting forth the toll structure itself is Exhibit Z to its attorney's declaration.  The TBTA may want to relegate its discrimination to the end of the alphabet but doing so cannot mask the discriminatory effect of its toll regime.  If there is any polestar guiding the constitutional provisions at issue it is that they exist to prohibit discriminatory differentials based upon State citizenship and that such a form of separate and unequal is not constitutionally permissible.  This has been true from literally the first relevant cases in the 1820s until today.

There is another elephant hiding in the TBTA brief – the fact that the impact of the preferential treatment of some New Yorkers has involved staggering amounts of money – millions more paid by the nonresidents or, conversely, millions saved by those residents.  Over the course of this lawsuit, it has involved hundreds of millions of dollars.  These amounts, of course, are certainly not what the TBTA wishes to recognize, but they are indisputable.

## STATEMENT OF FACTS

The Resident Toll Discounts were implemented to provide an economic advantage to certain residents of New York State that is not available to residents of other States or residents of other areas in New York.  Specifically, residents of the Rockaways and Broad Channel who use EZ Pass are able to traverse the Cross Bay Bridge, which connects the Broad Channel islands to the Rockaways, at no cost as the MTA rebates the entire toll amount.  (SUF 1).[2]  Residents of the Rockaways and Broad Channel may also cross the Marine Parkway Bridge, which connects the Rockaways to Brooklyn at a discount of one-third.  (SUF 2).  The discount afforded only to

---

[2] "SUF" references herein are to Plaintiffs' Statement of Undisputed Material Facts, filed concurrently herewith.

residents of Staten Island to cross the Verrazano Bridge is approximately 40 percent for EZ Pass

users and 20 percent for "cash" customers who pay with residency tokens.  (SUF 2).  Based upon

usage of the bridges by those not eligible to receive these discounts, the overcharges amount to

over seventy million dollars *each year*, as illustrated in the following chart:

|  | Cash Receipts from Nonresidents | EZ Pass Receipts from Nonresidents | Amount of Cash Overcharge | Amount of EZ Pass Overcharge | Total Overcharge |
|---|---|---|---|---|---|
| **VZN** |  |  |  |  |  |
| 2010 | $68,981,660 | $115,690,784 | $22,889,369 | $46,326,944 | $69,216,313 |
| 2009 | $74,077,553 | $115,674,039 | $24,580,279 | $46,320,239 | $70,900,518 |
| **MPB** |  |  |  |  |  |
| 2010 | $3,180,477 | $4,992,842 | $1,399,410 | $1,693,479 | $3,092,889 |
| 2009 | $3,241,257 | $4,846,099 | $1,426,153 | $1,643,706 | $3,069,859 |
| **CBB** |  |  |  |  |  |
| 2010 | $3,980,900 | $3,167,318 | $1,751,596 | $1,074,295 | $2,825,891 |
| 2009 | $3,808,610 | $2,942,614 | $1,675,788 | $998,080 | $2,673,868 |

Source: Minnuni Ex. 1 (SUF 3).  Extrapolating this data over the seven years since this lawsuit

was filed, the overcharges are approximately $500 million.  Even when not looked at in the

aggregate, the numbers are significant dollars.  The current cash and EZ Pass toll for non-Staten

Island residents on the Verrazano Bridge is $15.00 and $10.66, respectively, while residents only

pay a cash toll of $8.53 and EZ Pass toll as low as $6.00.  (SUF 3).  Further, as noted, the Cross

Bay Residence Discount for EZ Pass users permits the free use of that bridge, while others must

pay a toll of $2.00.  (SUF 3).

     A significant percentage of the travel by nonresidents across the Verrazano Bridge is

interstate.  The TBTA conducts Origin-Destination surveys periodically with the last completed

in 2005.  (SUF 4).  According to that study, 24.3% of the overall travel surveyed on a weekday

originated in New Jersey.  (SUF 4).  Applying this percentage to the overcharges demonstrated

in the chart above, results in $16,819,564 and $17,228,825 in overcharges to New Jersey

residents alone (not to mention residents of all other States) in 2010 and 2009, respectively.

The TBTA also surveyed trip purpose and determined that 68% of EZ Pass trips and 50% of cash trips on the Verrazano Bridge were for work purposes, a point underlined here by Plaintiffs Abraham, Goldstein and Schwartz who commuted.  (SUF 5, 8, 9, 11).  If all Brooklyn bound weekday trips are considered, 71% were for work and work-related purposes.  (SUF 5).  Mr. Jacobs, TBTA's Director of Planning and Analysis, also testified that he believed that percentage would not likely be different today.  (SUF 5).  A person currently commuting from New Jersey to say, Brooklyn, would pay (assuming 200 trips a year) $1,294 more in cash tolls and $932 more in EZ Pass tolls than an advantaged Staten Islander.  (SUF 3).  The TBTA's trip purpose study also reveals that 3.1% of the weekday trips and 9.3% of the weekend trips were for shopping purposes.  (SUF 6).  Thus, the TBTA's own studies reveal that a significant portion of travel on the Verrazano Bridge was interstate and to engage in commercial activity such as work and shopping – there are hundreds of thousands of such trips a year.[3]  Indeed, Plaintiff Bette Goldstein traversed the Verrazano Bridge regularly to commute to work in New York from New Jersey and to purchase kosher food in Brooklyn.  (SUF 8).  Plaintiff Hillel Abraham also regularly commuted from New Jersey to Brooklyn for work and to shop.  (SUF 9).  Plaintiff Riva Janes traversed the Verrazano Bridge from New Jersey to Brooklyn for the purpose of visiting her parents, and while there shopped for clothes and sundries at a discount store that did not exist near her home.  (SUF 10).  Plaintiff Bruce Schwartz, a resident of Flushing, Queens, and an accountant, traversed all three bridges to meet with clients.  (SUF 11).

The discriminatory scheme is, moreover, unnecessary.  Use or volume discounts are a non-discriminatory way to reduce the burden on those who use a bridge most frequently.

---

[3] The TBTA's surveys with respect to the Marine Parkway and Cross Island bridges are consistent.  Sixty-percent of weekday trips across the Marine Parkway Bridge are for work, and shopping was also a significant trip purpose.  (SUF 7).  Eighty-two percent of Queens-bound AM Peak trips on the Cross Bay Bridge are for work.  (SUF 7).

According to Defendants' expert, Kenneth Small, a rationale for affording use discounts is that "people who use it often would get a discount, so they didn't have to pay as much per year." (SUF 12).  Small also testified that an across-the-board volume discount could be set to provide for the same "subsidies," as he tellingly called them, to those who obtained the Resident Discounts.  (SUF 13).  If the TBTA afforded a use discount, those most dependent on the Verrazano Bridge (whether New Yorkers or otherwise) would be entitled to it regardless of where they live.

What is remarkable is that when the resident discount program for the Verrazano Bridge was before the Legislature in 1983, the MTA opposed its enactment as unconstitutional because, as the then-General Counsel of the MTA explained:  "By basing a discount on residency rather than frequency of use, it penalizes without rationale basis persons commuting daily to Staten Island by treating them worse than people commuting daily from Staten Island who use the bridge infrequently [sic] [or just as frequently]."  (SUF 14).  Now that the Legislature enacted the toll discounts, Defendants have to try to defend them.  But no less importantly, the Legislature's enactment was, in effect, political whim, for the TBTA has had to admit that it is not aware of any analysis that has been conducted as to how the *amount* of discounts provided were set or any consideration made as to whether the discounts afforded should be changed.  (SUF 15).

## ARGUMENT

### I.    Standard of Review

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on those undisputed facts.  FED. R. CIV. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court

must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Here, although many of the facts are not in dispute, the TBTA must still justify its toll structure because it is discriminatory. As set forth in detail below, Plaintiffs believe they have shown discrimination within the meaning of the claims at issue, and, accordingly, the burden shifts to the TBTA to show how its activities meet the requisite standard for the constitutional claim at issue. *See Maine v. Taylor*, 477 U.S. 131, 138 (1986); *see also Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (quoting *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 353 (1977)) (explaining burden shifting); *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255-56 (2d Cir. 2001) (same), *aff'd*, 550 U.S. 330, 338 (2007).

## II.     The TBTA Toll Structure Violates the Constitutional Rights to Travel and/or the Comity Clause of Article IV and/or the Equal Protection Clause and/or the <u>Privileges or Immunities Clause of the Fourteenth Amendment.</u>

### A.     The Right to Travel Claims Fall Squarely Within the Equal and Non-Discriminatory Right to Travel *Qua* Travel Protected by the Constitution.

The basic contention presented in this case – that the TBTA's differential toll scheme on the bridges at issue constitutes an impediment upon the fundamental right to travel – was addressed in the most seminal "right to travel" case, *Corfield v. Coryell*, 4 Wash. C. C. 371, 6 F. Cas. 546 (No. 3, 230) (C.C.E.D. Pa. 1825). In Justice Washington's "landmark opinion," to use Justice Thomas's words,[4] he famously explained what constitutes the privileges and immunities protected by the United States Constitution:

> We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than

---

[4] *Saenz v. Roe*, 526 U.S. 489, 524 (1999) (Thomas, *J.*, dissenting). The significance of Justice Thomas's recognition of the import of *Corfield* is discussed at pages 11-12, below.

> difficult to enumerate.  They may, however, be all comprehended under the following general heads: … <u>The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise;</u> …. These, and many others which might be mentioned, are, strictly speaking, privileges and immunities."

*Id.* at 551-52 (emphasis supplied).  Justice Washington's recognition of "[t]he right of a citizen of one state to pass through, or to reside in any other state" has underlain the entirety of the Constitution's right to travel jurisprudence.

What is remarkable about this case is that here, it is not just that a state has erected a *prima facie* barrier to travel amongst the States, but that New York has done so in an explicitly *discriminatory* fashion by providing preferential treatment solely to some New Yorkers. Nowhere in the history of constitutional jurisprudence has – at least until the few toll cases of recent years that the TBTA cites – a discriminatory imposition on the purest form of the right to travel been upheld.  As was stated in *The Passenger Cases* in 1849:

> We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, <u>as freely as in our own States.</u>  And a tax imposed by a State, for entering its territories or harbors, is inconsistent with the rights which belong to citizens of other States as members of the Union, and with the objects which that Union was intended to attain.  Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it.

48 U.S. (7 How.) 283, 492 (1849) (Taney, *C.J.* dissenting[5]) (emphasis added).

Had in 1788 (or in 1825 or 1849), the State of New York put a sign at the ferry dock on Manhattan Island (or on Staten Island) saying that to enter New York State, non-New Yorkers had to pay $1 but New Yorkers could pass into the state for fifty cents, Plaintiffs submit, there could be no possible question that such a levy would have been found flatly violative of the

---

[5] Chief Justice Taney's dissent was on other grounds; the principles stated in the words just quoted were in accordance with the recognized view of the law at the time.  *See Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 49 (1868).

Constitution.  That this is the first time in American constitutional history that such a kind of levy has been imposed and is now being argued to be lawful may simply underline that, at least until now, no one would have dreamed it would have been permissible.[6]

What has, however, occurred is that the disputes that have arisen, and that have bedeviled the jurisprudence for several generations, have been those laws implicating a state's provisions of benefits, services or impositions that do not directly impede travel *qua* travel but could have the indirect or corollary effect of doing so.  This is where the complicated line drawing is found – how does a state residency requirement to receive welfare impact the right to travel?  *See Shapiro v. Thompson*, 394 U.S. 618 (1969).  Does a one-year residency requirement for voting violate the right to travel?  *See Dunn v. Blumstein*, 405 U.S. 330 (1972) (holding that it does). Does a waiting period for receiving state-provided medical care violate the right?  *See Mem'l Hosp. v. Maricopa County*, 415 U.S. 250 (1974) (holding that it does).  Is the right violated by civil service preferences for state veterans?  *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ("*Soto-Lopez*") (holding that it does).  Do higher fishing and hunting license fees for out-of-state residents violate the right?  *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371 (1978) (holding that it does not).  Does making records available in a particularly accessible form only to state residents violate the right?  *McBurney v. Young*, 133 S. Ct. 1709 (2013) (holding that it does not).

The issue these decisions addressed is the extent to which the effects of a law, that does not address travel *qua* travel, may indirectly impact how someone otherwise travels, or migrates, or earns a living, or exercises the right to vote.  But the present case is the pure case of travel *qua*

---

[6] Possibly, in 1789, the geographical point at which such a differential fee was imposed might have had some significance, but, even if it did, under modern jurisprudence, it no longer does, and the Second Circuit, at least, views intrastate travel protections as equal to interstate.  *See Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 100 (2d Cir. 2009) ("*Selevan I*").

travel.  It implicates the very core protection within the Constitution of an _equal_ ability to travel amongst these United States.  The right of equal travel is considered a necessary element of the American polity, as was stated not just in *Corfield*, but also, for example, in *Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1869):

> It was undoubtedly the object of the clause in question [the Comity Clause] to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.  It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them…. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this…. Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists.

*Id*. at 180.

That the right of equality is a "fundamental right" cannot be gainsaid, and the progeny of the early cases has been reaffirmed in case after case.  When the Supreme Court stated that "[f]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution," *Soto-Lopez*, 476 U.S. at 901-02 (quotation omitted), it cited *Dunn*, 405 U.S. at 338; *The Passenger Cases,* 48 U.S. at 492 (Taney, *C. J.*, dissenting); *Crandall*, 73 U.S. at 43-44; *Paul*, 75 U.S. at 180; *Edwards v. California*, 314 U.S. 160 (1941); *Kent v. Dulles*, 347 U.S. 116, 126 (1958); *Shapiro*, 394 U.S. at 629-31; *Oregon v. Mitchell*, 400 U.S. 112, 237 (1970) (separate opinion of Brennan, White, and Marshall, *JJ*.); *id.* at 285-86 (Stewart, *J*., concurring in part and dissenting in part); and *Mem'l Hosp.,* 415 U.S. at 254.

The right as an equal application of "privileges and immunities" is made clear in the presently leading Supreme Court right to travel decision, *Saenz, supra.  Saenz* examined the constitutionality of a California statute limiting the welfare benefits available to newly-arrived

residents in the state.  In striking down the statute, Justice Stevens's majority opinion noted that the "right to travel" was nowhere expressly mentioned in the Constitution.  Nonetheless, he proceeded to consider aspects of the right as an outgrowth of a number of constitutional provisions, including the Comity Clause and the Privileges or Immunities Clauses of the Fourteenth Amendment.[7]  Observing that the right to travel was "firmly embedded in [the Court's] jurisprudence," 526 U.S. at 498, Justice Stevens divided the right into three separate "components" recognized by past cases: (1) "the right of a citizen of one State to enter and to leave another State"; (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State"; and (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State."  *Id.* at 500. When State laws or benefits disparately treated citizens versus non-citizens in these respects, the Court struck them down.  With respect to the first of these conditions, the Court explained how

---

[7] From all interpretive legal historical perspectives, the principle of equality and non-discrimination is recognized to be the Comity Clause's underlying principle.  For example, there is a debate as to whether there was a change between Article IV, Section 1, Clause 2 of the Articles of Confederation where there was a specific reference to interstate travel and the Comity Clause, and where that Article's wording was shortened.  According to the Supreme Court, "the [Articles of Confederation] provision was carried over into the comity article of the Constitution in briefer form but with no change of substance or intent, unless it was to strengthen the force of the Clause in fashioning a single nation." *Austin v. New Hampshire*, 420 U.S. 656, 661 (1975). While some legal historians have disagreed, even those commentators who have looked to a narrow view of the Comity Clause and its intent agree that its core purpose was to require equal treatment of visitors by a host state as it would treat its own citizens.  *See, e.g,*, Robert G. Natelson, *The Original Meaning of the Privileges and Immunities Clause*, 43 GA. L. REV. 1117, 1187-88 (2009) (arguing, based on historical precedents, that while the Comity Clause "did not guarantee a general right to travel" and "a host state had the power to impose travel restrictions on visitors" it could only do so "to the same extent the state imposed them on locals."); Kurt T. Lash*, The Origins of the Privileges and Immunities Clause, Part I: "Privileges and Immunities" as an Antebellum Term of Art*, 98 GEO. L. J. 1241, 1258-72 (2010) (arguing, from early nineteenth century cases, that even if the Comity Clause was not intended to create positive individual rights and was intended only to apply to State-created rights and benefits, States had to ensure that those rights and benefits were equally provided to its citizens and those of other States, so as "'to put a citizen on a par and an entire equality with every citizen in the State,'" what the author terms the Clause's "equality principles") (quoting *Gray v. Cook*, 8 Del. (3 Houst.) 49, 61 (1864)).

they were previously implicated in *Edwards*, which "invalidated a state law that impeded the free interstate passage of the indigent," and *United States v. Guest*, 383 U.S. 745 (1966), which "afforded protection to the 'right to travel freely to and from the State of Georgia and to use highway facilities and other instrumentalities of interstate commerce within the State of Georgia.'" *Saenz*, 526 U.S. at 500-01 (quoting *id.* at 757).  Those are the rights at issue here.

With respect to the second of these conditions, the Court, citing *Paul*, *supra,* explained, "Thus, by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Id.* at 501.  Both of these two "Privileges and Immunities" are at issue here.

Justices Rehnquist and Thomas dissented, each signing on to the other's opinion.  They only dissented, however, as to the Court's using a right to travel analysis to reach the third component, which, to them, constituted an unwarranted reach of the Comity Clause beyond its original moorings.  *See Saenz*, 526 U.S. at 514 (Rehnquist, *J.*, dissenting); *id.* at 521-26 (Thomas, *J.*, dissenting).  Both agreed that the right to travel equally and freely was what the Comity Clause was intended to protect.  Justice Rehnquist thus agreed with the first condition, "The right to travel clearly embraces the right to go from one place to another, and prohibits States from impeding the free interstate passage of citizens," and that, as to the second condition (equal treatment) in a host State, he had "no difficulty with aligning the right to travel with the protections afforded by [the Comity Clause], to nonresidents who enter other States 'intending to return home at the end of [their] journey.'" *Id.* at 512-13 (internal citation omitted).  Justice Thomas turned to historical analysis to support his narrow view of the right to travel (and also,

11

specifically, the Privileges or Immunities Clause) by contending that the "fundamental rights" protected by the Constitution were those set out by Justice Washington in *Corfield*. *Id.* at 525.[8]

Here, the TBTA's toll structures do, incontrovertibly, discriminate against out-of-state citizens; they violate the precepts and case law just addressed.  They preferentially charge non-New Yorkers more for the same bridge toll.  *See Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 100 n.4 (1994) (explaining how a fee that explicitly charged more to out-of-state waste than in-state waste was "easily found … to be facially discriminatory.").  Words lack meaning if one can possibly claim that the tolls imposed on travellers on the bridges at issue do not discriminate in favor of a group of New Yorkers as opposed to citizens of the other States in the Union, when the tolls discriminate against the purest form of travel – that of travelling on a roadway.  Indeed, in the case of the Verrazano Bridge, it is a major thoroughfare that (carrying Interstate 278) is part of what is now denominated the federal Dwight D. Eisenhower System of Interstate and Defense Highways.

---

[8] Justice Scalia, who joined the *Saenz* majority, and who otherwise believes that the Comity Clause should be limited to its original purposes, also agrees that its original purpose comprises certain "fundamental" rights, particularly those described by Justice Washington as "protect[ing] traveling citizens against state discrimination."  *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3067-38 (2010) (Scalia, *J.*, concurring).  In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), writing for the majority, he explained that barriers to intrastate movement to obtain an abortion did not implicate the right to interstate travel, unless intentionally applied in a fashion that discriminates against citizens of other States: "the right of interstate travel ... protects interstate travelers against two sets of burdens: the erection of actual barriers to interstate movement and being treated differently from intrastate travelers."  *Id.* at 276-77 (internal quotation marks omitted; citing *Paul,* 75 U.S. at 180 (art. IV, § 2 "inhibits discriminating legislation against [citizens of other states and] gives them the right of free ingress into other States, and egress from them"); *Toomer v. Witsell*, 334 U.S. 385, 395 (1948) (art. IV, § 2, "insure[s] to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy")).  While the more recently appointed Justices have not made known their views on the strength and nature of it, the point is that the fundamental right to travel *qua* travel has, without fail, been recognized by all members of the Court to be a matter of core importance, a "fundamental right" as to which States cannot discriminate.

The TBTA's toll structure is thus the kind of discriminatory imposition on a "fundamental right," which *Selevan I* explicitly recognizes must be evaluated pursuant to a strict scrutiny standard.  584 F.3d at 99 n.6.  It is also an instance of what, in *Selevan I*, the Second Circuit termed the "sort of 'invidious distinctions' that penalize the right to travel," which it set in apposition to the kind of burden that represents the cost of using the instrumentality of travel, *e.g.*, the road or bridge or transportation facility itself, to which the Second Circuit would apply a three-part *Evansville* test.  584 F.3d at 102.  While the term "invidious distinction" is most commonly used in the Equal Protection Clause jurisprudence to define the modern suspect classes of gender, race, etc., as used in the right to travel context, and in the case from which the Second Circuit drew the term, it refers precisely to the kind of distinctions being discussed herein, namely, a distinction impacting travel based upon an individual's citizenship.[9]  Indeed,

---

[9] The *Selevan I* reference, 584 F.3d. at 102, to "invidious distinctions" is rather confused:

> In *Evansville*, the Supreme Court recognized a difference between the sort of "invidious distinctions" that penalize the right to travel, *see Zobel* [*v. Williams,* 457 U.S. 55, 60 (1982)], and cases in which a state has simply levied "a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance," *see Evansville* [*Airport v. Delta Airlines, Inc.,* 405 U.S. 707, 714 (1972)]; *see also id.* at 713 & n.6.

The Second Circuit mixed two entirely different concepts.  *Evansville* did not discuss "invidious distinctions" at all – the words are not in the decision and the distinction that it drew was between impositions on travel that were imposed to pay for the transportation facility and those that were just imposed but not tied to the cost of the facility, as is addressed at pages 16-17, below.  That is not the kind of "invidious distinction" addressed in *Zobel*, which was a law which accorded state benefits based upon length of citizenship and which was struck down under an Equal Protection right to travel analysis.

Nonetheless, the Court's use of the term is apposite because it applies in Equal Protection cases to address "those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'" *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).  These words fit the present case because, (1) in the right to travel context, the definition of a suspect class necessarily has to be citizens of other States and (2) the classification impinges upon the exercise of a fundamental right.  Accordingly, an Equal Protection right to travel claim exists here coincident with the Supreme Court's view that the right is also protected by the Equal Protection Clause.  *See, e.g., Soto-Lopez*, 476 U.S. at 905-06.  Inasmuch as an Equal Protection claim

long before the modern Equal Protection "invidious distinctions" were even conceived, the first

use of the term "invidious distinction" was with respect to citizenship-based discriminatory

economic treatment, and for the same reasons that underlay both the Comity and Commerce

Clauses.  The Supreme Court first used the term in 1853 when it explained the purpose of the

Commerce Clause was "to establish a perfect equality amongst the several States as to

commercial rights, and to prevent unjust and invidious distinctions, which local jealousies or

local and partial interests might be disposed to introduce and maintain."  *Veazie v. Moor*, 55 U.S.

(1 Ho.) 568, 574 (1853); *see also Gibbons v. Ogden*, 22 U.S. (1 Wheat.) 1, 231 (1824) ("If there

was any one object riding over every other in the adoption of the constitution, it was to keep the

commercial intercourse among the States free from all invidious and partial restraints.")

(Johnson, *J.*; concurring in judgment); *cf. Hicklin v. Orbeck*, 437 U.S. 518, 531-32 (1978) (the

Comity and Commerce Clauses "stem[] from their common origin in the Fourth Article of the

Articles of Confederation and their shared vision of federalism.").

Accordingly, as the Second Circuit wrote in *Selevan v. N.Y. Thruway Auth.*, 711 F.3d

253, 258 (2d Cir. 2013) ("*Selevan III*"), explaining the *Selevan I* remand charge, "if the District

---

requires a showing of a "a *compelling* state interest," *Shapiro*, 394 U.S. at 638 (emphasis in
original), and even if not involving a suspect class (which this does), the toll structure would, at a
minimum, have to be "rationally related to a legitimate state interest."  *City of Cleburne v.
Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (collecting cases).  Defendants' objective of
aiding approximately half a million residents of "remote" areas purportedly not well-served by
public transportation, but not to the nonresidents who commute to or through those "remote"
areas fails under such a test.  The Supreme Court has emphasized that a "domestic preference"
aiding "the home team" (which is what the TBTA wishes) is impermissible under the Equal
Protection Clause (and Dormant Commerce Clause) because "promotion of domestic business by
discriminating against nonresident competitors is not a legitimate state purpose" and simply
putting forward an in-state interest sought to be aided cannot satisfy the rational relationship test
because "under the State's analysis, *any* discrimination subject to the rational relation level of
scrutiny could be justified simply on the ground that it favored one group at the expense of
another…. We hold only that such regulation may not be accomplished by imposing
discriminatorily higher taxes on nonresident corporations solely because they are nonresidents."
*Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880, 882 & n.10 (1984) (also holding that it does not
make a difference if the same discrimination also violates the Dormant Commerce Clause).

Court were to find that the toll policy involved 'invidious distinctions,' then the test of strict scrutiny would apply; if it were to determine that the toll policy was merely 'a minor restriction on travel,' then the three-part test announced in the Supreme Court's subsequent decision in *Northwest Airlines v. County of Kent,* 510 U.S. 355 (1993), would govern."[10]  Inasmuch as an invidious distinction has been shown – indeed, the very "invidious distinction" for which the term entered the constitutional lexicon – the TBTA's policy fails under *Selevan I*, because a reasonable, indeed, simple, alternative exists to achieve the toll policies' ends (*i.e.*, a use or volume-based fare, *see* pages 4-5, above).  The TBTA cannot meet a strict scrutiny test (nor could it meet an intermediate scrutiny test for the same reason).

## B.    The TBTA's *Selevan II* and *III* and "Minimal Burden" Defenses All Fail.

The TBTA puts forward essentially two defenses in this regard – that *Selevan II* and *III* should guide this Court and that the tolls "constitute a minor restriction" on the right to travel. There are several errors in Defendants' defenses.

The first is that neither *Selevan II* nor *III* actually addressed a Comity Clause claim, and, in *Selevan I,* the discussion as to the Comity Clause, even though it addressed the standing of a non-citizen of a particular state to invoke the Comity Clause, did not contain any "minor restriction" limitation.  The "minor restriction" limitation was contained *only* in the general

---

[10]  Despite the remand instruction, *Selevan v. N.Y. Thruway Auth.*, 2011 U.S. Dist. LEXIS 136068 (W.D.N.Y Nov. 28, 2011) ("*Selevan II*"), did not address, in any material way, the invidious distinction and right to travel analysis discussed herein, *see id.* at *18; on appeal in *Selevan III*, the Second Circuit effectively adopted that decision, but also without addressing the analysis set forth herein.  *See* 711 F.3d at 260.  In this case, however, the issue is fully presented.

There is an ambiguous, unanswered issue in the *Selevan I* remand asking the district court to determine if there was an invidious distinction or a minor travel restriction:  what if the state act was both an invidious distinction and characterizable as a minor restriction?  The answer has to be the invidious distinction comes first and trumps the size of the effect of the restriction.  Otherwise, the right to travel principle of equality and non-discrimination becomes limited to what might be termed "separate and unequal (but fair so long as not excessive)" – which cannot be squared with, *e.g.*, *Corfield*, *The Passenger Cases*, *Paul*, or *Edwards*.

"right to travel"/Privileges or Immunities Clause section of the decision.  *Compare* 584 F.3d at

98-101 *with* 101-02.  And, *Selevan II* and *III* did not adjudicate a Comity Clause claim.  *See*

*Selevan III*, 711 F.3d at 254 n.2.[11]

Second, and relatedly, the Supreme Court has *never* jettisoned the core/non-

discriminatory principle of the right to travel analysis, namely, the principle that travellers/

sojourners/citizens of and from other States must be treated *equally* as citizens of the host State.

As shown, it is the right to travel principle of equality and non-discrimination that is the

"fundamental right" underscoring the jurisprudence, and so held by whosoever on the Supreme

Court has expressed his or her views.

The "minor restriction" analysis that permits the imposition of tolls or fees to use wharfs,

roads or airports, has arisen in those situations where the toll or fee (and both terms have been

used interchangeably), was a uniform, non-discriminatory charge designed to offset the costs of

providing the mode of transportation.  *See* Dan T. Coenen, *State User Fees and the Dormant*

*Commerce Clause*, 50 VAND. L. REV. 795, 822 (1997) (analyzing the Supreme Court's "fee"

---

[11] *Surprenant v. Mass. Tpk. Auth.*, 2010 U.S. Dist. LEXIS 19060, at *22 n.12 (D. Mass. Mar. 4, 2010), noted this about *Selevan* but concluded that the Comity Clause was not violated because "the lack of a discount does not impede or prevent Surprenant from using the Tobin Bridge or the Tunnels.  It simply requires her to pay the same rate as almost all other travelers, including the overwhelming majority of Massachusetts residents.  Surprenant is free to travel on any of the alternative non-toll highways, roads, and bridges that are available to her and to residents of Massachusetts (as Surprenant concedes she has done on occasion in the past)."  *Id.* at *24.  Aside from misapplying the concept that a user fee can be discriminatorily based upon citizenship (which was taken from *Selevan I*), the very suggestion of "other options" shows how Surprenant, should she have wished to avoid paying more than some Massachusetts citizens, was an unequal second class citizen compared to them in her travel rights.  The decision erred.

The other toll cases relied upon by the TBTA are variants of this, holding that a "minimum" burden on travel is permissible and accepting the State's defenses arising out of an interest in mitigating traffic – an acceptance of the States' defenses that read the discriminatory aspects out of the cases.  *See Kelen v. Mass. Tpk. Auth.*, 2007 Mass. Super. LEXIS 262, at *5-12 (Mass. Super. Ct. May 3, 2007); *Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439, 446-47, 451 (D.R.I. 2011) (same as to Dormant Commerce Clause and right to travel claims).  Respectfully, as shown herein, Plaintiffs believe these courts (which follow each other) erred.

cases).  As noted already (page 13 n.9, above), the airport fees in *Evansville* (and in *Northwest Airlines*) were not based upon citizenship of the user; they were, in the words of *Evansville* itself, "uniform" and the third *Evansville/Northwest Airlines* test tries to determine if, even if facially neutral, the fees actually constituted discrimination or were intended to hide discrimination in neutral terms which the Court held it did not in *Evansville* because "both interstate and intrastate flights are subject to the same charges."  *Evansville*, 405 U.S. at 716-17.  Likewise, the user fees in *Northwest Airlines* were not facially discriminatory and the airline petitioners made no record showing discrimination in favor of in-state carriers by virtue of the airport's distinction in fees between the various groups that used it – distinctions that were not based upon citizenship of the entities.  *See* 510 U.S. at 358, 372-73; *accord* Coenen, *supra*, 50 Vand. L. Rev. at 822, 842 (recognizing how *Evansville* upheld the "anti-discrimination principle" which Professor Coenen views as the one rule that user fees cannot constitutionally breach).  But in this case, New York State has unambiguously imposed a differential toll based *solely* on *citizenship*.[12]

---

[12] In actuality, the Second Circuit's "minor burden" analysis is self-created and erroneous as applied to a State act impinging on travel based upon State citizenship.  In *Selevan I*, it wrote that "[o]ur observation that 'minor restrictions on travel simply do not amount to the denial of a fundamental right,' *Town of Southold*, 477 F.3d at 54 [], is consistent with the Supreme Court's jurisprudence."  584 F.3d at 101.  But in neither *Town of Southold* nor the Ninth Circuit case cited in *Selevan I*, *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (nor the case both *Miller* and *Southold* cited, *Kansas v. United States*, 16 F.3d 436, 442 (D.C. Cir. 1994)), did the courts address tolls discriminating on the basis of State citizenship – the evil addressed by the right to travel – but simply whether a toll to pay for an instrumentality was permissible.  The Supreme Court's jurisprudence does not, and has not, permitted directly discriminatory right to travel restrictions to proceed, even if "minor."  Even in the user fee cases, of which *Evansville* and *Northwest Airlines* are two, the anti-discriminatory principle has always held precedence.  *See* Coenen, *supra,* 50 Vand. L. Rev. at 821-22.  Indeed, in the Dormant Commerce Clause area, the Court has firmly rejected the idea that "any incidental burden on interstate commerce" can permissibly be "outweighed by [] 'local benefits,'" such as aiding an industry, *W. Lynn Creamery v. Healy*, 512 U.S 186, 204-05 & n.20 (1994), and also flatly held that the size of a differential burden on commerce "is of no relevance to the determination whether a State has discriminated against interstate commerce."  *Oregon Waste*, 511 U.S. at 100 n.4.  Inasmuch as the very right at issue here – the "right to go from one place to another" was "vindicated" under the Commerce Clause in *Edwards*, *see Saenz*, 526 U.S. at 500 – then the Second Circuit's "minor

Nor, despite what the TBTA may assert, do the decisions in *Selevan II* and *III* hold

otherwise.  Irrespective of anything else, neither evaluated the *Evansville/Northwest Airlines*

third prong as a United States citizens' right to travel *qua* travel issue; both, rather, addressed it

as a Dormant Commerce Clause matter relating to in-state economic competitors.  *See* 2011 U.S.

Dist. LEXIS 136068, at *9 & 711 F.3d at 211.  Beyond any doubt, the right to travel and the

Comity Clause apply to "citizens" and not commercial interests, whether competing or not.  *See*

*Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 282 n.11 (1985) ("The Court has

never held that the Privileges and Immunities Clause protects only economic interests.").

The third error in the TBTA's defense is that, even with a confining read of *Selevan I*, *II*

or *III*, the TBTA's toll structures fail.  Notwithstanding both the Second Circuit's creation of a

"minor restriction" exception from the principle of a non-discriminatory right to travel (*see* note

12, above), and its failure to explicate what constitutes (its apparently subjective view of what is)

a "minor" restriction, the TBTA toll differentials are hardly "minor."  The kinds of sums at issue

cannot fairly be termed "minor" in any meaningful way.  These are substantial whether on a trip-

by-trip basis, on a weekly basis, monthly basis, annual or in the aggregate.[13]

Finally, and irrespective of all the foregoing, the TBTA's toll structure violates the

alternative analysis that the Second Circuit has stated it would need to pass – the three-part

*Evansville* test.  The failure to pass the third prong, the prong addressing discrimination, is, we

submit, patent, and has already been addressed.  The TBTA's tolls are plainly, facially and

---

restriction" right to travel exception is the very kind of "novel understanding of discrimination"
that cannot be "reconcile[d]" with the Supreme Court's precedents.  *Oregon Waste*, 511 U.S. at
100 n.4.

[13] While the basis for the Second Circuit's conclusion that the Grand Isle Bridge toll in *Selevan
III* constituted only a "minor burden" is murky, the decision seems to suggest that the Court was,
at least in some measure, driven by the small size of toll differentials which it twice referred to as
a "very small amount."  711 F.3d at 259 & 260 n.8.  The record here is to the contrary.

undeniably discriminatory within the meaning of the "anti-discrimination principle," to use Professor Coenen's term.  They therefore cannot survive under *Evansville/Northwest Airlines*.

As to the first and second prongs, the TBTA also fails them.  To conclude that the tolls at issue represent "some fair approximation of use" when the TBTA is not even aware of any analysis justifying the amount of the discounts (SUF 15), and that it forces nonresidents using EZ Pass to pay up to $4.66, or 77%, more than residents for the Verrazano Bridge, and $2 for the Cross Bay Bridge, which residents can cross for free, is to ignore economic facts.[14]  It also defies logic to conclude that the fees are not excessive in relation to the costs or to the benefits conferred.  Any benefits motorists enjoy from lower road and highway congestion due to a strong mass transit system are enjoyed by TBTA facility users and non-users alike, so an analysis under the prong linking those unquantifiable indirect benefits with TBTA tolls is not valid.

Moreover, the tolls do not provide a "fair share" or "fair approximation" where those who use the bridge more – which the TBTA admits is true of the advantaged New Yorkers (Def. Br. at 2) – pay less.  Indeed, some get their trips for free.  They literally pay no share at all, yet their cars are no different and they get more value out of the bridges and use them (allegedly) more, not less.  Someone is getting a "more fair" approximation of use and someone else is getting a "less fair" approximation.  Only by putting on blinders to ignore the citizenship-based discrimination, can the tolls become a "fair approximation" and a "fair share" cost.

---

[14] In support of its position, the TBTA cites *Selevan III*, which inaptly (711 F.3d at 259 n.5) relied on a fee exemption for military personnel in *Evansville*.  What the *Selevan III* court failed to see, aside from the point that aiding service personnel is a non-invidious distinction, is that it took what had been countenanced as a *de minimis* benefit in *Evansville* extended to a non-suspect class and extended it to a group that, though not large in number, constituted a significant portion of facility usage.  The TBTA asks this Court to compound that error with Staten Island and Rockaway area residents who are the majority users of the facilities at issue here.

In sum, from virtually every perspective, the TBTA's discriminatory toll system goes to the very heart of what is protected by the right to travel and the TBTA's justifications for it ultimately only underline the manner in which it is a scheme to advantage some New Yorkers economically against all others. The right to travel is a profound component of our American Constitution; it goes to the heart of our Union. All Supreme Court precedent for almost two centuries has required that any State infringements on it be non-discriminatory and that any benefits accorded the State's citizens vis-à-vis travel itself be equally offered to the citizens of the other States. The TBTA tolls violate this principle, and hence the Constitution.

III.   **The TBTA Toll Schemes Violate the Right to Travel/Right to Pursue a Trade Protected by the Comity Clause.**

Aside from the right to travel *qua* travel analysis addressed above, there is a separate right to travel violation present here, the right to be free from discrimination in travelling to earn a living. The TBTA's brief literally ignores this claim, yet, given the extent of the impact of its discriminatory tolls on tens of thousands of commuters, it cannot be so readily sidestepped, even if this is a matter of first impression. The concomitant subset of the right to travel, that of earning a living, is no less well-established historically; indeed, it was mentioned by Justice Washington in *Corfield*. As stated in *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 430 (1871), the Comity Clause "plainly and unmistakably secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade, or business, without molestation; to acquire personal property; [and] to take and hold real estate. . . ." The Supreme Court has respected and reiterated this right and recognized it as fundamental. *See, e.g., Baldwin*, 436 U.S. at 386; *Hicklin*, 437 U.S. at 525-26.

The review test for a discriminatory infringement on a right to earn a living was set out in *Hicklin*, and, under it, a State must show that there is a "substantial reason" for the

discrimination which means, in this context, that "there is something to indicate that noncitizens constitute a peculiar source of the evil at which the discriminatory statute is aimed." *Hicklin*, 437 U.S. at 525-26 (citing and quoting *Toomer*, 334 U.S. at 398 (quotation omitted)); *accord United Bldg.*, 465 U.S. at 214 ("As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to constitute a peculiar source of the evil at which the statute is aimed."; also recognizing that the right to livelihood applies even where a state only preferentially treats a subset of its citizens). Further, "even where the presence or activity of nonresidents causes or exacerbates the problem the State seeks to remedy, there must be a reasonable relationship between the danger represented by non-citizens, as a class, and the discrimination practiced upon them." *Hicklin*, 437 U.S. at 525 (quotation omitted). And, in "deciding whether the discrimination bears a close or substantial relationship to the State's objective," the court looks to "the availability of less restrictive means." *Piper*, 470 U.S. at 284.

The TBTA cannot make these showings – indeed, cannot even try to do so – because, of course, its justifications for the toll scheme are grounded in aiding the inhabitants of the areas for whom it preferentially treated the New York State citizens and not from any peculiar "evil" attributable to others, such as the Plaintiffs and Class here. Nor could the TBTA show that there are no less restrictive means because there is one, as TBTA's expert has conceded here, and as the MTA pointed out when the Legislature imposed the Verrazano toll. Defendants have not proffered any defense for the Comity Clause claim premised on the right to pursue a livelihood, nor can they, and the toll scheme should be invalidated on that basis alone.

**IV.    The TBTA's Toll Structure Violates the Dormant Commerce Clause.**

New York State's attempts to treat its own commercial interests preferentially – indeed, commerce revolving around New York Harbor itself – are not new to this case. Dormant Commerce Clause jurisprudence begins with the New York Legislature's 1808 grant to Robert

Livingston and Robert Fulton of the exclusive privileges to operate steam or fire-driven ships

within the State's waters.  *See Gibbons*, 22 U.S. at 1-2, 8.  Some years later, the monopoly

(which was now in the hands of Ogden) challenged a competitor (Gibbons) who was operating a

steamboat between New York and New Jersey.  *Id.* at 1, 8-9.  After Gibbons lost in the New

York courts, in its first Commerce Clause case, the Supreme Court struck down the monopoly.

As the Supreme Court has summarized the case and its principles:

> During the first years of our history as an independent confederation, the National
> Government lacked the power to regulate commerce among the States. Because each
> State was free to adopt measures fostering its own local interests without regard to
> possible prejudice to nonresidents, what Justice Johnson characterized as a "conflict
> of commercial regulations, destructive to the harmony of the States" ensued. *See
> Gibbons v. Ogden*, 9 Wheat. 1, 224, 6 L.Ed. 23 (1824) (opinion concurring in
> judgment). In his view, this "was the immediate cause that led to the forming of a
> constitutional convention." *Ibid.* "If there was any one object riding over every other
> in the adoption of the constitution, it was to keep the commercial intercourse among
> the States free from all invidious and partial restraints." *Id.* at 231.

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 571 (1997); *see

also Veazie*, 55 U.S. at 574 (describing discriminatory state economic enactments as "invidious

discrimination"); *see also* page 17 n.12, above (noting how *Edwards*, a Dormant Commerce

Clause decision, upheld the right to travel).

When a State act is facially discriminatory, as the Supreme Court has made clear in case

after case, the act is virtually *per se* invalid.  Notwithstanding the TBTA's odd assertion that it

matters that "only" several hundred thousand individuals take advantage of the preferential toll

(Def. Br. at 17), the Dormant Commerce Clause can be violated by a state aiding a single local

interest, *see C&A Carbone Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 386-87 (1994)

(one waste treatment facility in a single New York village), and the Supreme Court has been

emphatic that it does not matter how much interstate activity was impacted.  *Oregon Waste*, 511

U.S. at 100 n.4 ("The dissent argues that the $2.25 per ton surcharge is so minimal in amount

that it cannot be considered discriminatory, even though the surcharge expressly applies only to

waste generated in other States.  The dissent does not attempt to reconcile that novel

understanding of discrimination with our precedents, which clearly establish that the degree of a

differential burden or charge on interstate commerce 'measures only the *extent* of the

discrimination' and 'is of no relevance to the determination whether a State has discriminated

against interstate commerce.'") (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992);

emphasis in original).

It thus need not matter, as the Court has asked, if the discrimination also impacts other

New York citizens.  *C&A Carbone*, 511 U.S. at 391 ("The ordinance is no less discriminatory

because in-state or in-town processors are also covered by the prohibition") (citing *Dean Milk

Co. v. Madison*, 340 U.S. 349, 345 n.4 (1951) (finding it "immaterial that Wisconsin milk from

outside the Madison area is subjected to the same proscription as that moving in interstate

commerce."); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Res.*, 504 U.S.

353, 361 (1992) ("[O]ur prior cases teach that a State (or one of its political subdivisions) may

not avoid the strictures of the Commerce Clause by curtailing the movement of articles of

commerce through subdivisions of the State, rather than through the State itself").

Nor does it matter that there was an allegedly laudable goal underlying the

discrimination.  The Supreme Court has expressly rejected such a pure heart defense because in

every Dormant Commerce Clause case there is some plausibly desirable intent:

> We also find unpersuasive the State's contention that there was no discriminatory
> intent on the part of the legislature because "the exemptions in question were not
> enacted to discriminate against foreign products, but rather, to promote a local
> industry."  If we were to accept that justification, we would have little occasion ever
> to find a statute unconstitutionally discriminatory.  Virtually every discriminatory
> statute allocates benefits or burdens unequally; each can be viewed as conferring a
> benefit on one party and a detriment on the other, in either an absolute or relative
> sense. The determination of constitutionality does not depend upon whether one
> focuses upon the benefited or the burdened party.  A discrimination claim, by its

23

> nature, requires a comparison of the two classifications, and it could always be said that there was no intent to impose a burden on one party, but rather the intent was to confer a benefit on the other. Consequently, it is irrelevant to the Commerce Clause inquiry that the motivation of the legislature was the desire to aid the makers of the locally produced beverage rather than to harm out-of-state producers.

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 273 (1984). In *W. Lynn Creamery*, the Court invoked Justice Cardozo's "eloquence" to reject the contention that such benefits as protecting a local industry or aiding the environment could save a State law under the Clause:

> To give entrance to that excuse [of protecting local economic actors] would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.

512 U.S. at 205-06 (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523 (1935) (Cardozo, *J.*)). Or, as the Court wrote in *Metro. Life Ins. Co.*, a state preference that aids the "home team" is not permissible. 470 U.S. at 885 (also cited at page 14 & n.17, below). Nor, despite what the TBTA implies, do Plaintiffs have to prove discriminatory intent, as the Supreme Court made clear in *Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978). It is "when a statute has only indirect effects on interstate commerce and regulates evenhandedly, [that] we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits" and strict scrutiny is not applied. *Wyoming*, 502 U.S. at 455 n.4. Since the tolls at issue are not evenhanded, but facially discriminatory, intent need not be shown.

While the TBTA relies on *Selevan* for its Dormant Commerce Clause argument, there are three errors in this reliance. The first is that the Second Circuit itself erred – presumably inadvertently – if indeed its view is that only "commercial" interests are protected by the Dormant Commerce Clause and not individuals acting as "consumers."[15] In 1949, for instance,

---

[15] In actuality, a consumer/economic interest differential makes no economic or constitutional sense. Waste cartilage or milk sales are no more "economic" activity or "commerce" than are

the Supreme Court viewed sellers of goods and their purchasers as equally protected by the

Dormant Commerce Clause when it hypothesized, among other laws, a New York State milk law

that would discriminatorily aid "local consumers," rejecting it as impermissible because "every

consumer may look to the free competition from every producing area in the Nation to protect

him from exploitation by any.  Such was the vision of the Founders; such has been the doctrine

of this Court which has given it reality." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525,

539 (1949).  In *Camps Newfound/Owatonna*, the Supreme Court was likewise clear:

> The Town argues that 'the Commerce Clause protects out-of-state competitors but
> does not protect out-of-state consumers.'  Brief for Respondents 16.  As the
> discussion above indicates, our cases have rejected this view.

520 U.S. at 578 (citing and, *inter alia*, quoting *Brown-Forman Distillers Corp. v. New York State*

*Liquor Auth.,* 476 U.S. 573, 580 (1986) ("Economic protectionism is not limited to attempts to

convey advantages on local merchants; it may include attempts to give local consumers an

advantage over consumers in other States.")).  The Court explained, "By encouraging economic

isolationism, prohibitions on out-of-state access to in-state resources serve the very evil that the

dormant Commerce Clause was designed to prevent."  *Id*. at 578.  This evil is no less true when a

consumer from New Jersey seeks to go shopping in Brooklyn, such as Plaintiffs Goldstein and

Abraham, or when an advantaged Staten Islander does so.  Such an "economic effect[]" is "more

than enough to bring the [TBTA's tolls] within the purview of the Commerce Clause.  It is well

---

purchasing goods or services; such a distinction is insupportable as a matter of elementary
economics or common parlance.

    The state actor Dormant Commerce Clause decisions also show that the Clause is not
limited to direct economic competitors.  *See Wyoming, supra* (upholding Wyoming's tax revenue
loss challenge due to Oklahoma statute requiring Oklahoma utilities to use at least ten percent
Oklahoma coal); *Hunt*, 432 U.S. at 345 (Washington state agency (which neither grew nor sold
apples) that received assessments based on volume of Washington apples sold had standing
because it would potentially receive smaller assessments if restrictions reduced sale of
Washington apples).

settled that the actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow." *C&A Carbone*, 511 U.S. at 389.

Second, even within the confines of *Selevan I*, that decision is clear that it was only because no in-state competing commercial interest was identified in the complaint, that the Court moved to the three-part *Evansville/Northwest Airlines* test upon which the TBTA rests its motion. *Selevan I*, 584 F.3d at 95.[16] Yet, if competing non-consumer commercial interests are necessary, the TBTA errs when it writes that Plaintiffs "can neither identify a specific 'in-state commercial interest that is favored' by the toll, nor a specific 'out-of-state competitor' that is harmed by it." Def. Br. at 2. Both plainly exist here in the form of the individuals – whether the advantaged New Yorkers or those unable to get Resident Discounts – who pursue their trades by driving across the Bridges at issue, including, as shown, some of the Plaintiffs here and the TBTA's own statistics showing thousands and thousands of such trips. *See* page 4, above.

The TBTA also writes that commercial interests are not impacted because "[o]nly individuals—not businesses" can get Resident Discounts. Def. Br. at 17. But we all know that thousands of individuals pursue their commercial callings using their passenger automobiles, such as Plaintiffs Abraham, Goldstein and Schwartz, or an attorney coming to this Courthouse or the White Plains Courthouse from either Staten Island or New Jersey. Nearly a century ago, the Supreme Court recognized that "it being a matter of common knowledge that from necessity, due

---

[16] The TBTA believes (Def. Br. at 15 n.4) the appropriate review should be that of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Aside from *Selevan I*'s rejection of *Pike*, *Pike* would not be met because it requires that "the statute regulates even-handedly," which is not true here. *Metro. Life Ins. Co.*, 470 U.S. at 877 (under *Pike* a "state statute promoting a legitimate local interest must regulate evenhandedly"). And, "a statute need not be perfectly tailored to survive *Pike* balancing, but it must be reasonably tailored: 'the extent of the burden that will be tolerated … depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.'" *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycles, Inc.*, 401 F.3d 560, 569 (4th Cir. 2005) (quoting *id.*). Given the alternative of a use discount, the toll scheme was not so tailored.

to the geographical situation of that city, in close proximity to the neighboring States, many thousands of men and women, residents and citizens of those States, go daily from their homes to the city and earn their livelihood there.  They pursue their several occupations side by side with residents of the State of New York….," *Travis v. Yale & Towne Mfg.*, 252 U.S. 60, 80 (1920), and used such common sense to strike down a discriminatory New York taxing law.  A century later, we certainly cannot have retreated from this real world and common knowledge, even if the TBTA wants to hope that the Second Circuit might do so.  *See* Def. Br. at 17.

Yet, even if one were fantastically to pretend that there were no Staten Islanders and no out-of-state travellers in the Class pursuing their particular commercial activities, there are the thousands of commuters, as discussed, who include both individuals who continue to pay higher, real and substantial discriminatory amounts to use the TBTA's facilities and individuals who continue to save millions of dollars.  Just as in 1920, when the Supreme Court recognized that the commuters into New York competed with New Yorkers for work, the same is true here.

That labor and labor markets are encompassed by the Commerce Clause is indisputable. Indeed, it is the very basis for the constitutionality of the Fair Labor Standards Act itself, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 31 (1937), and has long been recognized by the Supreme Court.  *See, e.g.*, *Baldwin*, 294 U.S. at 527 ("Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with … the labor of its residents"); *H. P. Hood & Sons, Inc.*, 336 U.S. at 537-38 ("Our system, fostered by the *Commerce Clause*, is that every farmer and every craftsmen shall be encouraged to produce by the certainty that he will have free access to every market in the Nation…."). In striking down a New York City commuter tax (levied only on commuters), the New York Court of Appeals explicitly recognized that out-of-state

27

workers who commute into New York City from New Jersey are protected by the Dormant

Commerce Clause and rejected the very argument the TBTA would make here:

> The State argues that Commerce Clause analysis is not implicated here because
> plaintiffs failed to show that chapter 5 has a demonstrable effect on any
> identifiable interstate market.  It has long been recognized, however, that the
> movement of persons across State lines is a form of commerce…. Here,
> thousands of New Jersey and Connecticut residents commute into New York City
> on a daily basis, earning and spending part of their income in New York City,
> while paying the commuter tax.  This clearly impacts interstate commerce.

*City of New York*, 94 N.Y.2d at 597 (citing *Camps Newfound/Owatonna*, 520 U.S. at 573).[17]

Third, even assuming it was reached, as discussed, the toll structure here cannot meet the

first and second prongs of *Evansville/Northwest Airlines*.  *See* page 19, above.

Finally, the TBTA, citing Professor Small's report, also claims that the toll discounts "do

not discriminate against interstate commerce, and that the effect of the toll structure 'on interstate

commerce . . . is a positive rather than a negative one.'  (Herzog Decl., Ex. B at 22.)."  Def. Br.

at 19.  But Professor Small simply opined that having tolls at certain levels, by discouraging

traffic, aids commerce.  He did not opine, indeed could not opine (and nothing the TBTA has

---

[17] The *City of New York*, *Travis* and *Lunding v. New York Tax Appeals Tribunal,* 522 U.S. 287
(1998), commuter tax cases underscore why the TBTA's toll scheme is unconstitutional.  The
TBTA is an arm of New York State.  The Supreme Court has made it clear – indeed, twice – that
a state – indeed, New York State – cannot preferentially treat its citizens who work in New York
City as a tax matter compared to citizens of other states – and states are accorded particular
leeway in tax classifications.  *Travis*, *supra* (striking down discriminatory New York commuter
tax)*; Lunding*, *supra* (same); *accord City of New York*, *supra* (same; New York Court of
Appeals); *American Trucking Ass'ns v. Michigan PSC*, 545 U.S. 429, 438 (2005) ("a tax will be
sustained where it is applied to an activity with a 'substantial nexus' to the taxing State; where, if
applied to interstate activity, it is 'fairly apportioned'; *where it does not discriminate*; and where
it is 'fairly related to the services provided'") (emphasis added; quoting *Complete Auto Transit,
Inc. v. Brady*, 430 U.S. 274, 281-82, 288 (1977) (also holding that this rule applies both to taxes
on interstate and intrastate businesses)).  In light of these cases, New York could not possibly
provide some New York City residents a preferential tax deduction to pay for commutation.  Yet,
in a real and undeniable sense (given the commutation figures, *see* page 4), that is what New
York State is doing through the TBTA's toll scheme.  Allowing New York State, through the
TBTA, to exact higher commutation impositions because they are "fees" rather than "taxes"
would be the kind of form over substance that the Supreme Court rejects.  *See Complete Auto
Transit,* 430 U.S. at 281.

submitted would support) the proposition that having the *discriminatory* toll structures has aided any member of the Class, much less aided "interstate commerce" generally. This case is not about whether tolls on bridges can be good things generally or whether having an integrated transit system in New York City is a good thing, but it is about the *discriminatory* tolls at issue that thousands and thousands of individuals pay and from which some privileged New Yorkers get citizen-based discounts. In effect, Professor Small does little except put a gloss on the kind of defense that *Bacchus* and *W. Lynn Creamery* reject as permissible under the Dormant Commerce Clause. *See* pages 23-24, above. Moreover, Professor Small assumed, incorrectly, that if the resident toll discount programs are found to be unconstitutional, the tolls on the affected bridges would have to be lowered to the discounted rate for all travelers and thereby lead to greater congestion. Rather, Plaintiffs contend that a use or volume discount should be available to all travelers, and, as Professor Small has conceded, one could be set without an adverse impact on congestion. *See* pages 4-5, above.

In sum, this case presents a State action that "discriminates on its face against interstate commerce," and as to which, "[i]n this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n*, 550 U.S. at 338 (citation omitted); *accord, e.g., C&A Carbone*, 511 U.S. at 393. Accordingly, absent a showing that New York has "no other means to advance a legitimate local interest," which, as demonstrated, cannot be made here, the TBTA's tolls fail under the Dormant Commerce Clause. *United Haulers Ass'n*, 550 U.S. at 338.

29

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Dated: August 23, 2013

Respectfully submitted,

By:  /s/ Seth Lesser
     Jeffrey A. Klafter
     Seth R. Lesser
     KLAFTER OLSEN & LESSER LLP
     Two International Drive, Suite 350
     Rye Brook, New York 10573
     Tel:  (914) 934-9200

     -and-

     Harley J. Schnall
     LAW OFFICE OF HARLEY J. SCHNALL
     711 West End Avenue
     New York, New York 10025
     Tel:  (212) 678-6546

     *Attorneys for Plaintiffs and the Class*