UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RIVA JANES, BRUCE SCHWARTZ, BETTE GOLDSTEIN, and HILLEL ABRAHAM individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>                    v.<br><br>TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, METROPOLITAN TRANSPORTATION AUTHORITY, JAY H. WALDER, as Chairman and Chief Executive Officer of the Metropolitan Transportation Authority, and JAMES FERRARA, as President of the Triborough Bridge and Tunnel Authority,<br><br>                    Defendants. | No. 06-CV-1427 (PAE) (HBP)<br><br>ECF Case |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

| | |
|---|---|
| Jeffrey A. Klafter<br>Seth R. Lesser<br>KLAFTER OLSEN & LESSER LLP<br>Two International Drive, Suite 350<br>Rye Brook, NY 10573<br>Tel: (914) 934-9200<br>Fax: (914) 934-9220 | Harley J. Schnall<br>LAW OFFICE OF HARLEY J. SCHNALL<br>711 West End Avenue<br>New York, New York 10025<br>Tel: (212) 678-6546 |

*Attorneys for Plaintiffs and the Class*

Pursuant to Local Civil Rule 56.1, Plaintiffs Riva Janes, Bruce Schwartz, Bette Goldstein, and Hillel Abraham respectfully submit that there is no genuine dispute as to the material facts set out below in Section I.  Plaintiffs' positions with respect to Defendants' Statement of Undisputed Material Facts are set forth in Section II below.

I.      **Plaintiffs' Statement of Undisputed Material Facts**[1]

1.      Residents of the Rockaways and Broad Channel who use EZ Pass are able to traverse the Cross Bay Bridge, which connects Broad Channel to the Rockaways, at no cost as the MTA rebates the entire toll amount. Fredericka Cuenca ("Cuenca") Tr. at 35; Hilary D. Ring ("Ring") Tr. 73. The portions of the Cuenca deposition and Ring deposition transcript cited herein are attached as Exhibits A and B, respectively, to the Declaration of Jeffrey A. Klafter, filed herewith ("Klafter Dec.").

2.      Residents of the Rockaways and Broad Channel may also cross the Marine Parkway Bridge, which connects the Rockaways to Brooklyn, at a discount of one-third. Ring Tr. 32 (Klafter Dec., Ex. B). The discount afforded only to residents of Staten Island to cross the Verrazano Narrows Bridge is approximately 40 percent for EZ Pass users and 20 percent for "cash" customers who pay with resident tokens. *See* Minnuni Ex. 1 (attached, with explanatory transcript pages, as Klafter Dec., Ex. C).

3.      The usage of the three bridges at issue by those not eligible to receive these discounts, the tolls they paid and the tolls paid by those eligible to receive these discounts, for the years 2004 - 2010 is set forth in Minunni Ex. 1 (Klafter Dec., Ex. C).  The current tolls on each of the three bridges are as follows:

---

[1] The following Undisputed Facts are cited in Plaintiffs' accompanying Memorandum in Opposition to Defendants' Motion for Summary Judgment and herein as "SUF ____."

1

|  | Non-Resident Cash Toll | Resident Cash Toll (Token) | Non-Resident EZ Pass Toll | Resident EZ pass Toll |
|---|---|---|---|---|
| Verrazano Narrows Bridge (collected only westbound) | $15.00 | $8.53 | $10.66 | $6.00 (3+ trips/month) - $6.36 (2+ trips/month) |
| Cross Bay Bridge & Marine Parkway Bridge | $3.75 | $1.79 | $2.00 | $1.31 (rebated) |

Source: http://web.mta.info/bandt/traffic/btmain.html.

4.      The TBTA conducts Origin-Destination surveys periodically, with the last completed in 2005. Daniel Jacobs ("Jacobs") Tr. 13-23 (All portions of the Jacobs' deposition transcript cited herein are included in Klafter Dec., Ex. D).  According to that study, 24.3% of the overall travel on the Verrazano Bridge surveyed during a weekday originated in New Jersey. Jacobs Ex. 1 at MTATBTA 0000009 (Klafter Dec., Ex. E).

5.      The TBTA also surveyed trip purpose and determined that 68% of EZ Pass trips and 50% of the cash trips on the Verrazano Bridge were for work purposes.  *See* Jacobs Tr. 36-38 (Klafter Dec., Ex D); Jacobs Ex. 3 at MTATBTA00014319 (Klafter Dec., Ex. F).  If all Brooklyn-bound weekday trips are considered, the TBTA survey revealed that 71% were for work and work-related purposes. Jacobs Ex. 1 at MTATBTA00000035 (Klafter Dec., Ex. E); Jacobs Tr. 51-53 (Klafter Dec., Ex. D).  Jacobs, the TBTA's Director of Planning and Analysis, also testified that he believed that percentage would not likely be different today.  Jacobs Tr. 4, 54-55 (Klafter Dec., Ex. D).

6.      The TBTA's trip purpose study with regard to the Verrazano Bridge also reveals that 3.1% of the weekday trips and 9.3% of the weekend trips were for shopping purposes. Jacobs Ex. 1 at MTATBTA00000035 (Klafter Dec., Ex. E).

7.      The TBTA's survey results with respect to the Marine Parkway Bridge and Cross Bay Bridge are similar to the Verrazano Bridge survey results -- 60% of weekday trips across the Marine Parkway Bridge are for work, and shopping was also a significant trip purpose.  Jacobs Ex. 5 at MTATBTA0001430 (Klafter Dec., Ex. G).  82% of northbound AM Peak trips on the Cross Bay Bridge are for work.  Jacobs Ex. 4 at MTATBTA00013893 (Klafter Dec., Ex. H).

8.      Plaintiff Bette Goldstein traversed the Verrazano Bridge regularly in a family car to commute to work in New York from New Jersey and to also purchase kosher food in Brooklyn.  Goldstein Tr. 35-40, 46-48, 66 (Klafter Dec., Ex. I).

9.      Hillel Abraham also regularly commuted in a family car from New Jersey to work in Brooklyn and to also shop there and he periodically traversed the Marine Parkway Bridge for the purpose of transporting his stepson to and from the stepson's family.  Abraham Tr. 19-21, 28-34, 39-45 (Klafter Dec., Ex. J).

10.     Plaintiffs Riva Janes traversed the Verrazano Bridge from New Jersey to Brooklyn in a car she leased for purposes of visiting her parents and while there shopped for clothes and sundries at a discount store that did not exist near her home. Janes Tr. 24-26, 69-77 (Klafter Dec., Ex. K).

11.     Plaintiff Bruce Schwartz, a resident of Flushing, Queens, and accountant, traversed all three bridges at issue in a car he owned to meet with clients.  Schwartz Tr. 17-23, 28-31, 34-37 (Klafter Dec., Ex. L).

12.     Use or volume discounts are a way in which to reduce the economic burden on all of those who use a bridge most frequently. Small Tr. 19-20 (Klafter Dec., Ex. M).

13.     The level of an across-the-board volume discount could be set to provide for the same subsidies the tolls on the Verrazano Bridge, Cross Bay Bridge and Marine Parkway Bridge

currently provided to the MTA's other operations. Small Tr. 73-74 (Klafter Dec. Ex., M).  It is also possible to set a uniform toll between the level of the resident discounts and amounts paid by non-residents that would not materially increase road congestion.  Small Tr. 69-70 (Klafter Dec., Ex. M).

14.     When the resident discount program for the Verrazano Bridge was before the New York legislature in 1983, the MTA opposed its enactment as unconstitutional because as the then-General Counsel of the MTA explained: "By basing a discount on residency rather than frequency of use, it penalizes without rationale basis persons commuting daily to Staten Island by treating them worse than people commuting daily from Staten Island who use the bridge infrequently [sic] [or just as frequently]."  Ring Ex. 6 at MTATBTA 00000786-87 (Klafter Dec., Ex. N).

15.     The TBTA is not aware of any analysis that was been conducted by the legislature or otherwise as to how the amount of discounts provided were set or any consideration made as whether the discounts afforded should be changed.  Ring Tr. 58-63 (Klafter Dec., Ex. B).

II.     **Plaintiffs' Response to Defendants' Statement of Material Undisputed Facts**[2]

The numbered paragraphs below correspond to the numbered paragraphs in Defendants' Statement of Material Undisputed Facts, which are included herein for easy reference.  To the extent Plaintiffs admit Defendants' Statements, they do not concede their relevance or admissibility and reserve all rights to challenge their admissibility.

---

[2] In their Statement, at n. 1, Defendants complain that Plaintiffs did not meet and confer on each of their 56 factual statements.  Defendants' however, did not provide their proposed Statement to Plaintiffs until July 18, 2013 (and a revised version on July 19, 2103) and given the extensive nature of their factual contentions, Plaintiffs stand by their decision to respond in the normal course and they do so herein.

**Procedural Posture**

1.      On February 22, 2006, both as individuals and putative representative plaintiffs, Riva Janes and Bruce Schwartz filed a class action complaint.  (Complaint, Dkt. No. 1.)

2.      On June 16, 2010, the representative plaintiffs filed a First Amended Complaint (the "Complaint"), which added two additional putative representative plaintiffs, Bette Goldstein and Hillel Abraham.  (First Amended Complaint, Dkt. No. 38.)

3.      Defendants filed an Answer to the Complaint on July 16, 2010.  (Answer to First Amended Complaint, Dkt. No. 39.)

4.      On October 5, 2011, the Court entered an Order granting class certification.  (October 5, 2011 Order, Dkt. No. 51.)

5.      On October 19, 2011, defendants filed a motion for reconsideration of the Court's October 5, 2011 Certification Order seeking redefinition of the class to exclude class members who lacked standing to seek injunctive and declaratory relief.  (Defendants' Motion for Reconsideration, Dkt. No. 53.)

6.      On January 23, 2012, the Court issued an Opinion and Order granting defendants' motion for reconsideration.  The Court redefined the class for what it described as "the Rule 23(b)(2)/liability phase" of the case as follows:

> With regard to the First, Third, and Fourth Causes of Action in the First Amended Complaint, all users of E-ZPass who, while residing in New York, Pennsylvania, New Jersey, or Connecticut, and who, since January 17, 2000, paid tolls at the Verrazano-Narrows Bridge, the Cross Bay Veterans Memorial Bridge, or the Marine Parkway Gil Hodges Memorial Bridge without the benefit of the resident discount that has been made available by defendants for residents of specific locations in New York State.  Excluded from the class are: (1) current residents of Staten Island, the Rockaway Peninsula, and Broad Channel; (2) persons who no longer have a driver's license or who are no longer living; and (3) persons who have not crossed any of the bridges at issue within the two years preceding

October 5, 2011.  Also excluded from the class are defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

(January 23, 2012 Order at 10, Dkt. No. 68.)

7.     Fact and expert discovery have since been completed.  (March 6, 2013 Scheduling Order, Dkt. No. 79.)

8.     In their Complaint, plaintiffs challenge certain toll discounts provided to residents of Staten Island for crossings over the Verrazano-Narrows Bridge (the "Verrazano-Narrows Bridge") and to residents of the Rockaways and Broad Channel for crossings over the Cross Bay Veterans Memorial Bridge (the "Cross Bay Bridge") and Marine Parkway-Gil Hodges Memorial Bridge (the "Marine Parkway Bridge") pursuant to sections 553-f, 553-h, and 553-i of the New York Public Authorities Law and section 1021.1 of title 21 of the New York Codes, Rules and Regulations (the "Resident Discounts").  The Complaint alleges that the Resident Discounts violate the Commerce Clause of the United States Constitution (U.S. Const. art. I, § 8, cl. 3), the Privileges and Immunities Clauses of the United States Constitution (U.S. Const. art. IV, § 2, cl. 1; U.S. Const. amend. XIV, § 1), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (U.S. Const. amend. XIV, § 1); as well as the Equal Protection Clause of the Constitution of the State of New York (N.Y. Const. art. 1, § 11); and support claims of unjust enrichment and for monies had and received under the common law of the State of New York. (First Amended Complaint ¶¶  34-55, Dkt. No. 38.)

9.     Specifically, with regard to plaintiffs' Commerce Clause claim, plaintiffs allege that the Resident Discounts "discriminate[] against out-of-state interests in favor of competing in-state interests in various interstate markets, including those for labor, housing, retail goods and tourism" and that they "disadvantage out-of-state interests and favor certain in-

6

state interests competing with them in the interstate labor, retail, real estate, and other markets."
(First Amended Complaint ¶¶ 25, 36, Dkt. No. 38.)

Plaintiffs admit Statement Nos. 1-9.

**Components of New York's Integrated Transit System**

10.     The MTA was created by the New York State Legislature in 1965.  The
MTA, with its affiliates and subsidiaries, is "North America's largest transportation network,"
and includes the subways, buses, commuter railroads, and nine of the major bridges and tunnels
that serve the New York metropolitan region.  In 2012, the annual ridership on MTA public
transportation was 2.6 billion, while TBTA bridges and tunnels carried more than 280 million
vehicles.  (Herzog Decl., Ex. S [The MTA Network].)

Plaintiffs admit only that the MTA asserts on its website that "The MTA, with its
affiliates and subsidiaries, is "North America's largest transportation network" and that "In 2012,
the annual ridership on MTA public transportation was 2.6 billion, while TBTA bridges and
tunnels carried more than 280 million vehicles."  Plaintiffs otherwise admit that the MTA's
predecessor was created by the New York State Legislature in 1965.

A.     **Subways and Buses**

11.     The New York City Transit Authority ("NYCTA") is an affiliate of the
MTA and operates the subways and, with its subsidiary the Manhattan and Bronx Surface
Transit Operating Authority ("MaBSTOA"), buses within the City of New York (the "City").
(See N.Y. Pub. Auth. Law § 1202; Herzog Decl., Ex. S [The MTA Network].)

Plaintiffs admit this Statement.

12.     NYCTA has an annual ridership of 2.3 billion, with 7.6 million people
riding the subways and buses every weekday.  There are 24 subway lines, 224 bus routes, and

45,537 employees.  In 2013, NYCTA had an operating budget of $9.9 billion.  (Herzog Decl., Ex. S [The MTA Network].)

       Plaintiffs admit only that the MTA asserts these facts on its website.

       13.     NYCTA also operates the Staten Island Railway.  The Staten Island Railway consists of a single line, with an annual ridership of 4.4 million, and 15,993 people riding each weekday.  The Staten Island Railway has 271 employees and, in 2013, its operating budget was $53.7 million.  (Herzog Decl., Ex. S [The MTA Network].)

       Plaintiffs admit only that the MTA asserts these facts on its website.

       14.     The MTA Bus Company is a subsidiary of the MTA and was created in 2004 to service areas formerly served by seven private bus companies.  (Herzog Decl., Ex. S [The MTA Network]; Herzog Decl., Ex. A [Moss Report] at 23-24.)

       Plaintiffs admit only that the MTA asserts these facts on its website.

       15.     MTA Bus has an annual ridership of 120.9 million and an average weekday ridership of 390,685.  There are 79 bus routes, covering 927 miles, with 3,629 employees.  In 2013, MTA Bus had an operating budget of $661.8 million.  (Herzog Decl., Ex. S [The MTA Network].)

       Plaintiffs admit only that the MTA asserts these facts on its website.

**B.    Commuter Railroads**

       16.     The Long Island Rail Road ("LIRR") is a subsidiary of the MTA and the largest commuter railroad in the nation, spanning 594 miles of track and 11 rail lines.  With an annual ridership of 81.8 million, LIRR serves approximately 285,082 weekday customers on 1,165 rail cars and has 6,414 employees.  In 2013, LIRR had an operating budget of $1.7 billion. (Herzog Decl., Ex. S [The MTA Network].)

       Plaintiffs admit only that the MTA asserts these facts on its website.

17.     The Metro-North Railroad ("MNR") is a subsidiary of the MTA and serves New York City's northern suburbs with three major lines: Harlem, New Haven, and Hudson.  It has 795 miles of track, an average of 281,331 passengers every weekday, and an annual ridership of 83 million.  MNR has 6,002 employees and, in 2013, it operated with a $1.4 billion budget.  (Herzog Decl., Ex. S [The MTA Network].)

Plaintiffs admit only that the MTA asserts these facts on its website.

### C.     Bridges and Tunnels

18.     The TBTA, an affiliate of the MTA, oversees the operations of nine toll bridges and tunnels within the City: the Robert F. Kennedy (formerly, the Triborough) Bridge, the Throgs Neck Bridge, the Verrazano-Narrows Bridge, the Bronx-Whitestone Bridge, the Henry Hudson Bridge, the Marine Parkway Bridge, the Cross Bay Bridge, the Queens Midtown Tunnel, and the Hugh L. Carey (formerly, the Brooklyn Battery) Tunnel.  (N.Y. Pub. Auth. Law § 553; Herzog Decl., Ex. S [The MTA Network].)

Plaintiffs admit this Statement.

19.     In 2012, 282.8 million vehicles travelled through or across the TBTA's tunnels and bridges.  The TBTA has 1,545 employees and, in 2013, it operated with a $586.5 million budget.  (Herzog Decl., Ex. S [The MTA Network].)

Plaintiffs admit only that the MTA asserts these facts on its website.

### The Integration of the MTA and its Affiliates and Subsidiaries

20.     The New York State Legislature created the MTA (initially as the Metropolitan Commuter Transportation Authority) in 1965 for the express purpose to the continuance, development, and improvement of commuter transportation within the metropolitan commuter transportation district and to "develop and implement a unified mass transportation

policy for [the metropolitan commuter transportation] district." (N.Y. Pub. Auth. Law § 1264; *see also* Herzog Decl., Ex. A [Moss Report] at 4; Herzog Decl., Ex. B [Small Report] at 5-6.)

      Plaintiffs admit this Statement.

      21.    In 1968, the NYCTA (and its subsidiary, MaBSTOA) and TBTA were placed under the common control of the MTA Board. (N.Y. Pub. Auth. Law § 1264; Herzog Decl., Ex. A [Moss Report] at 26; Herzog Decl., Ex. B [Small Report] at 5-6.)

      Plaintiffs admit this Statement.

      22.    From the MTA's inception, the TBTA was authorized by the Legislature to establish and collect tolls sufficient not only to support direct TBTA operations and capital projects, but also to contribute to the MTA's larger purpose of providing an integrated transportation network that benefits all travelers in the region, including but not limited to those travelling by automobile. (N.Y. Pub. Auth. Law §§ 553(12), (17), 569-c, 1219-a(2)(b); *see also* N.Y. Pub. Auth. Law § 1264; Herzog Decl., Ex. A [Moss Report] at 26; Herzog Decl., Ex. B [Small Report] at 6.)

      Plaintiffs admit that the TBTA is governed by the referenced statutes and otherwise deny this Statement.

      23.    For the year 2011, pursuant to statute, the TBTA provided $939.6 million from its tolls and other sources of revenue in total support for mass transit. TBTA transferred operating surplus in the amount of approximately $527,658,000 (approximately $201,545,000 to NYCTA and approximately $326,113,000 to the MTA for LIRR and MNR); TBTA also made debt service payments of approximately $131,637,000 on MTA's behalf and approximately $280,205,000 on NYCTA's behalf. TBTA also transferred $85,100 in investment income to the MTA. (Herzog Decl., Ex. T [Financial Statements as of & for the Years Ended December 31,

2011 and 2010] at 12; Herzog Decl., Ex. Y [Feb. 6, 2012 Staff Summary] at V-1, V-10; Herzog

Decl., Ex. A [Moss Report] at 31.)

Plaintiffs deny that the same subsidy can only be provided by maintenance of the

Resident Discount program. *See* SUF 13. Plaintiffs otherwise admit this Statement.

24.     Four of every five rush-hour commuters to New York's central business

district[3] take mass transit. (Herzog Decl., Ex. S [The MTA Network]; Herzog Decl., Ex. A

[Moss Report] at 4.)

Plaintiffs admit only that the MTA asserts this fact on its website.

25.     In his report served on October 3, 2012, defendants' expert Professor

Kenneth Small opined that, by "divert[ing] numerous travelers in the region from the roadways,"

New York's public transportation network "makes it possible for users of the roadways to travel

without excessive road congestion," and that, absent public transportation options, "the road

facilities would be overwhelmed by demand far exceeding their capacities." (Herzog Decl., Ex.

B [Small Report] at 15, 20.)

Plaintiffs admit that Professor Small so opined but deny that a determination that the

TBTA's Resident Discount program is unconstitutional would have a material negative impact

on road congestion. As Professor Small testified, lower tolls, such as those available to Staten

Island residents, contribute to congestion and it is possible to set a uniform toll that does not

materially increase congestion. Small Tr. 68-70 (Klafter Dec., Ex. M).

26.     In his report served on October 3, 2012, defendants' expert Professor

Mitchell Moss likewise observed that encouraging "choice" travelers (those who have the option

---

[3]  New York's central business district is defined as Manhattan south of 60th street. (Herzog
Decl., Ex. D [Ring Ex. 12] at MTATBTA 10749.)

of driving) to choose public transit reduces bridge congestion.  (Herzog Decl., Ex. A [Moss Report] at 43-45.)

Plaintiffs admit that Professor Moss so stated but deny that a determination that the TBTA's Resident Discount program is unconstitutional would have a material negative impact on road congestion.  As Professor Small testified, lower tolls, such as those available to Staten Island residents, contribute to congestion and it is possible to set a uniform toll that does not materially increase congestion.  Small Tr. 68-70 (Klafter Dec., Ex. M).

27.    Hilary Ring, then Director of Government Affairs at the MTA, testified on behalf of defendant TBTA during a deposition in this case that: "[T]he MTA runs a network and everyone in the city uses this network . . . the roads are intricately connected to the subways. When the subways don't work, if there is a strike for example, remember, you know, it was very hard to get around in general."  (Herzog Decl., Ex. C [Ring Deposition Tr.] at 50.)

Plaintiffs admit that Hilary Ring so testified but deny, as baseless, that "everyone in the city uses the MTA's network" and further deny that a determination that the TBTA's Resident Discount program is unconstitutional would have a material negative impact on road congestion. As Professor Small testified, lower tolls, such as those available to Staten Island residents, contribute to congestion and it is possible to set a uniform toll that does not materially increase congestion.  Small Tr. 68-70 (Klafter Dec., Ex. M).

28.    The Reports to the Boards of the MTA and TBTA in Connection with Proposed Toll Changes created when tolls are increased likewise stated:

> The TBTA crossings linking Manhattan with the other boroughs share common travel markets with the MTA's public transportation services and are also faced with limited available capacity.  A disruption in service on a commuter train or transit line, such as a blackout strike or service breakdown, can result in increased traffic and congestion at one or more of these crossings.  Traffic delays

can then result in increased vehicular congestion on connecting roadways, creating a ripple effect throughout the highway network.

Given the interdependence of the highway and transit networks, a decline in transit service quality can be expected to result in increased use of the already over-burdened highway network, without any practical means to provide additional road capacity. A significant share of the CBD-bound work trips made by transit, both those originating in the City and in the suburbs, are made by commuters who also have access to an automobile. These commuters evaluate the costs of auto travel versus both the cost and qualitative conditions of public transportation and may be inclined to switch to their cars if the relative quality of mass transportation declines.

(Herzog Decl., Ex. D [Ring Ex. 12] at MTATBTA 10750-51; Herzog Decl., Ex. U [MTATBTA 10772] at MTATBTA 10776-77; Herzog Decl., Ex. E [Ring Ex. 11] at MTATBTA 10727; Herzog Decl., Ex. F [Ring Ex. 10] at MTATBTA 10678; Herzog Decl., Ex. V [MTATBTA 8680] at MTATBTA 8686.)

Plaintiffs only admit that the Reports to the Boards included the quoted Statements. Plaintiffs further deny that the Resident Discount Programs alleviate congestion or that a determination that the TBTA's Resident Discount program is unconstitutional would have a material negative impact on road congestion. As Professor Small testified, lower tolls, such as those available to Staten Island residents, contribute to congestion and it is possible to set a uniform toll that does not materially increase congestion. Small Tr. 68-70. (Klafter Dec., Ex. M).

29.     Several of the Reports to the Boards also examine the effects of the December 2005 Transit strike, stating:

Among the shifts in travel patterns were: vehicles with more than twice the number of people in them during the peak period; significant shifts in vehicle flow from the 8-9am to the 11am-noon period, as well as significant increase in 4-5am trips with some people leaving home as early as 2-3am to beat the rush; a shift of the outbound peak to the 7-11pm period rather than 3-7pm: about 85,000 more morning passengers on commuter rail (55,000 on LIRR; 30,000 on Metro-North) and about 80,000 more on PATH.

(Herzog Decl., Ex. D [Ring Ex. 12] at MTATBTA 10754-55; Herzog Decl., Ex. U [MTATBTA 10772] at MTATBTA 10780; Herzog Decl., Ex. E [Ring Ex. 11] at MTATBTA 10730-31.)

Plaintiffs only admit that the Reports to the Boards included the quoted Statements. Plaintiffs further deny that the Resident Discount Programs alleviate congestion or that a determination that the TBTA's Resident Discount program is unconstitutional would have a material negative impact on road congestion. As Professor Small testified, lower tolls, such as those available to Staten Island residents, contribute to congestion and it is possible to set a uniform toll that does not materially increase congestion. Small Tr. 68-70 (Klafter Dec., Ex. M).

30.     In his supplemental report on the effects of Superstorm Sandy served on January 23, 2013, defendants' expert Professor Mitchell Moss observed that "[i]n the days following Superstorm Sandy, without the subways and commuter railroads operating normally, major arteries leading to Manhattan were jammed and city streets were in gridlock. . . . The severe gridlock conditions prompted Governor Cuomo to declare a transportation emergency." Moss elaborated that, although rules requiring that cars entering Manhattan have at least three passengers and the resumption of partial subway and commuter rail services helped to decrease traffic volumes, "without a fully functioning multi-modal regional transportation system— including subways, commuter rail, and vehicular tunnels—commuting times were substantially longer than normal"—nearly tripling "from an average of 47 minutes pre-Sandy to an average of 115 minutes post-Sandy." (Herzog Decl., Ex. G [Moss Supp. Report] at 13-14.)

Plaintiffs admit that Professor Moss so stated in his supplemental report but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on the functioning of the MTA's mass transportation system. As confirmed by Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the MTA

14

can be provided by means of volume discounts available to all users of these bridges.  *See* SUF 13.

**Economic Benefits of New York's Integrated Transportation System**

31.     Defendants' expert Professor Kenneth Small explained in his report that "[t]he ability of a large urban area like New York to sustain its economic vitality, despite high costs, is widely recognized as due to advantages of size," known as "economies of agglomeration."  The advantages of agglomeration, he elaborated, in turn depend on "good transportation options to connect people throughout the urban area."  (Herzog Decl., Ex. B [Small Report] at 4.)

Plaintiffs admit that Professor Small so stated in his report but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on providing "good transportation options to connect people throughout the urban area."  As confirmed by Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the MTA can be provided by means of volume discounts available to all users of these bridges.  *See* SUF 13.

32.     Professor Small also stated in his report:

> [T]he users of the bridges are receiving the benefits of the regional agglomeration in the New York region, made possible by the integrated transportation system that the bridges and tunnels are a part of.  That agglomeration makes the region substantially more productive economically, resulting in increased economic activity, including wage rates, and makes possible the enormous cultural and other benefits available (and in some cases, only available) in the New York region.

(Herzog Decl., Ex. B [Small Report] at 20.)

Plaintiffs admit that Professor Small so stated in his report but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on providing "the benefits of regional agglomeration in the New York region."  As confirmed by

15

Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the MTA can be provided by means of volume discounts available to all users of these bridges. *See* SUF 13.

33.     Professor Small concluded that "the dominant effect which the MTA's system of revenue transfers has on interstate commerce" is "creating an economic environment where businesses engaged in interstate commerce can thrive," an effect he classifies as "a positive rather than a negative one." (Herzog Decl., Ex. B [Small Report] at 22.)

Plaintiffs admit that Professor Small so stated in his report but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on the "MTA's system of revenue transfers." As confirmed by Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the MTA can be provided by means of volume discounts available to all users of these bridges. *See* SUF 13.

34.     Defendants' expert Mitchell Moss's report echoes this point:

> [T]he transportation services provided by the MTA's affiliates and subsidiaries are essential to the economic functioning of the region. Without these services, it would not be possible for workers to reach their workplace, or for goods to reach their intended destination. Nor would it be possible for the large number of visitors and tourists that currently visit the New York region to travel to and through the city and region. The services provided by the MTA and its affiliates make possible the significant density of economic activity that characterizes the New York metropolitan area, and that fuels its productivity and prosperity and that of the larger region and state.

(Herzog Decl., Ex. A [Moss Report] at 57.)

Plaintiffs admit that Professor Small so stated in his report but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on the "transportation services provided by the MTA's affiliates and subsidiaries." As confirmed by Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the

MTA can be provided by means of volume discounts available to all users of these bridges.  *See* SUF 13.

35.     The Reports to the Boards of the MTA and TBTA in Connection with Proposed Toll Changes likewise state:

> If a well-run mass transportation system were not available, automobile travel delays would continue to mount and the cost of doing business would rise as well. As a result, the New York metropolitan region would become less competitive with other parts of the country.  Many businesses would consider leaving the region for areas with better, more convenient transportation systems.

(Herzog Decl., Ex. D [Ring Ex. 12] at MTATBTA 10751; Herzog Decl., Ex. U [MTATBTA 10772] at MTATBTA 10777; Herzog Decl., Ex. E [Ring Ex. 11] at MTATBTA 10727; Herzog Decl., Ex. F [Ring Ex. 10] at MTATBTA 10678; Herzog Decl., Ex. V [MTATBTA 8680] at MTATBTA 8687.)

Plaintiffs admit that the Reports to the Boards so state but deny that the TBTA's Resident Discount program has, or if it were held to be unconstitutional would have, any bearing on the ability of the MTA to provide "a well-run mass transportation system."  As confirmed by Professor Small, the same subsidy provided by the tolls on the three bridges at issue to the MTA can be provided by means of volume discounts available to all users of these bridges.  *See* SUF 13.

**TBTA Tolls and Discounts for Residents of Geographically Isolated Areas**

36.     The New York State legislature has provided that residents of Staten Island, the Rockaways, and Broad Channel receive discounts for crossing their local bridge(s) and the TBTA Board has provided toll discounts to these residents using E-ZPass, an electronic toll collection system in use on TBTA bridges and tunnels since the mid-1990's.  (N.Y. Pub. Auth. Law. §§ 553-f, 553-h, 553-i; N.Y. Comp. Codes R. & Regs. tit. 21, § 1021.1; Herzog Decl., Ex. AA [Discount Programs].)

Plaintiffs admit this Statement.

37.    TBTA toll policy reflects other distinctions among different classes of motorists and vehicles using the Verrazano-Narrows Bridge, Cross Bay Bridge and Marine Parkway Bridge, including discounted tolls for customers of the New York E-ZPass Customer Service Center ("NYCSC"), which are available to all regardless of residence.  (*See* Herzog Decl., Ex. Z [Crossing Charges].)

Plaintiffs only admit to the distinctions reflected in SUF 3 and that there is a carpool rate for Staten Island residents only if three or more persons are in the vehicle.  *See* http://web.mta.info/bandt/traffic/btmain.html.

38.    The Resident Discounts are available only to individuals—not businesses. (N.Y. Pub. Auth. Law. §§ 553-f, 553-h, 553-i; N.Y. Comp. Codes R. & Regs. tit. 21, § 1021.1; Herzog Decl., Ex. AA [Discount Programs].)

Plaintiffs admit only that Resident Discounts are only made available directly to individuals, who may be engaged in business activities and/or commuting to or from work, such as Plaintiffs Abraham, Goldstein and Schwartz, *see* SUF 8, 9 and 11.  Further, there is no regulation or MTA policy that precludes businesses from being the beneficiaries of these discounts when they reimburse individuals for their toll expenses.

39.    The undiscounted E-ZPass toll rate for the Cross Bay and Marine Parkway Bridges is currently $2.00.  The undiscounted E-ZPass toll rate for the Verrazano-Narrows Bridge is currently $10.66, and is collected in one direction only.  (Herzog Decl., Ex. Z [Crossing Charges].)

Plaintiffs admit this Statement.

40.     As of February 15, 2013, there are 164,001 Staten Island Resident E-Z Pass Accounts and 39,459 Staten Island Resident Sticker Accounts for the purchase of discounted resident tokens and carpool tickets; there are 19,375 Rockaway Resident E-ZPass Accounts and 1,851 Rockaway Resident Sticker Accounts for the purchase of discount resident tokens.  (Terry Decl. ¶ 2.)

Plaintiffs admit this Statement.

41.     New York State's total estimated population as of 2012 is 19,570,261. (Herzog Decl., Ex. R [Census Data].)

Plaintiffs admit this Statement.

42.     Of the four named plaintiffs, three have not changed their use of the Verrazano-Narrows, Cross Bay, or Marine Parkway bridges at all in light of the tolls, and the fourth has used an alternate route on occasion.  (October 5, 2011 Order, Dkt. No. 51, at 4–5; Herzog Decl., Ex. H [Janes Deposition Tr.] at 44, 69-82; Herzog Decl., Ex. I [Goldstein Deposition Tr.] at 35-48; Herzog Decl., Ex. J [Abraham Deposition Tr.] at 32-40; Herzog Decl., Ex. K [Schwartz Deposition Tr.] at 20-22, 33-34, 37-38.)

Plaintiffs admit this Statement.

43.     Hilary Ring testified on behalf of defendant TBTA about the rationale for the discount to residents of the Rockaways and Broad Channel for crossings over the Cross Bay Bridge:

> [T]here was a feeling that the Rockaway residents were disadvantaged in how they were able to access other parts of the borough.  It's the only borough where you have to pay a toll to do an intra-borough crossing; that there are portions of the borough that you have to pay a toll to go to church, to go to school, to go to borough hall, to do your normal course of business.  And the board determined that the way to deal with that would be providing a discount. . . . Because the people who live in Broad Channel are—the parish is divided by the bridge, the

19

shopping, the close shopping is in the Rockaways, and a lot of people in Broad Channel have to go back and forth many times a day to do their daily business.

He continued, "[The TBTA] obviously were concerned about the fact that the multiple daily use of people traveling in this community would have an impact on those residents." (Herzog Decl., Ex. C [Ring Deposition Tr.] at 10-12, 27.)

Plaintiffs admit that Mr. Ring so testified but deny that there was any basis for this "feeling" as Mr. Ring admitted that no studies were done as to the frequency of Broad Channel residents traveling back and forth to the Rockaways or any studies done as to the frequency Howard Beach residents travelled to and from the Rockaways. Ring Tr. 12-13 (Klafter Dec., Ex. B).

44.    A 1980 draft memorandum from the Executive Officer and Chief Engineer of the TBTA to the Executive Director of the MTA at the time states the following rationale for the resident discounts on the Cross Bay Bridge:

> [T]he [Cross Bay Bridge] connects two parts of the same community and must be used for shopping trips, to attend school or visit the community hospital and that to these residents it is not simply a commuter route to and from work. They pointed out that this multiple daily use would compound the impact of any increase. These are the very factors that our Board took into consideration in approving a resident discount for Cross Bay in 1979.

(Herzog Decl., Ex. L [Ring Ex. 3] at MTATBTA 427.)

Plaintiffs admit that the draft memorandum so states but deny this statement was supported by any empirical data. *See* Ring Tr. 12-13 (Klafter Dec., Ex. B).

45.    Hilary Ring also testified on behalf of defendant TBTA about the rationale for the discount to residents of the Rockaways and Broad Channel for crossings over the Marine Parkway Bridge:

> The rationale for that facility would be consistent in that people in the Rockaways are transportation-disabled, disadvantaged.  And if they have to go shopping, if

they have to go to the mall, they have to conduct their business, they still have to
get off the peninsula for the most part, and to do so they would go over one of
those two crossings [the Cross Bay Bridge or Marine Parkway Bridge].

He added, "You don't have many choices, that's the whole point of the discounts in the

Rockaways."  (Herzog Decl., Ex. C [Ring Deposition Tr.] at 60, 94.)

Plaintiffs admit Mr. Ring so testified but deny the statement regarding residents' choices,

as well as the validity of this rationale because residents of the Rockaways have relatively easy

access through Inwood to Queens (*See* Response to Statement 46) and, as to the Marine Parkway

Bridge, it provides a means for residents of the Rockaways or Broad Channel to travel to a

different borough (Brooklyn) and therefore the bridge does not connect two portions of the same

community.  Ring Tr. 59-61 (Klafter Dec., Ex. B).

46.    Residents of the Rockaway peninsula can get to the rest of New York City

without crossing a TBTA facility, but they must first leave Queens and travel through Long

Island before returning.  (Herzog Decl., Ex. X [MTA Bridges & Tunnels Map].)

Plaintiffs only admit that residents of the Rockaway peninsula have a number of options

to travel to the rest of New York City without crossing the Cross Bay or Marine Parkway

Bridges.  The A subway line services the Rockaways, Klafter Dec., Ex. O.  Bus service is also

available and so is Ferry service to Wall Street at a cost of $2.00  Klafter Dec., Ex. P.  In

addition, if driving, as an alternative to travelling across the Cross Bay Bridge, they need only

drive to the Nassau Expressway which is on the border of Queens and Nassau Counties and

which provides a viable northbound route to the Belt Parkway, Van Wyck Expressway, and

thereby all points in Queens.  Klafter Dec., Ex. Q.  The resident discount is also afforded to

residents of the Rockaways east of Cross Bay Boulevard all the way to the Nassau County line,

and for such residents, most of Queens is closer by travelling east to the Nassau Expressway as compared to crossing the Cross Bay Bridge. *Id.*

47.     Hilary Ring also testified on behalf of defendant TBTA about the rationale for the discount to residents of Staten Island for crossings over the Verrazano-Narrows Bridge:

> The MTA today feels that residents of Staten Island are isolated from the rest of the transportation network, and that it is good public policy to provide a discount to residents of Staten Island so that they can get to other parts of the city without paying the same level of toll. . . . [T]he MTA feels that there are transportation challenges with Staten Island.  There is no subway.  Most people in New York use the subway to commute around the city.  There is no direct rail connection between Staten Island and any of the other boroughs as there are in any other parts of the city.  To drive from Staten Island to any place else in the city you have to pay a toll, and that is—is different than any other borough.  And, you know, those present certain challenges that the MTA board feels are—that the MTA board feels should be addressed by providing residents with a discount . . . .

(Herzog Decl., Ex. C [Ring Deposition Tr.] at 45-46.)

Plaintiffs admit that Mr. Ring so testified but deny that the MTA's views today have any bearing on the justification for the residency discount on the Verrazano Bridge which was enacted in 1983.  The justification offered when the legislature approved the bill in 2003 was that "[b]oth Richmond residents who work outside of Richmond and those who commute to or through Richmond are discriminated against solely on the basis of geography."  Ring Ex. 6 at MTATBTA0000777 & 778 (Klafter Dec., Ex. N). Those who commute to or through Richmond, however, continue to be discriminated against solely on the basis of citizenship and geography.

48.     The bill jacket for Chapter 350 of the Laws of 1983 states that the rationale for the resident discounts on the Verrazano-Narrows Bridge is that "Richmond is the only borough in New York City which does not have free crossings to the other boroughs of New York."  (Herzog Decl., Ex. M [Ring Ex. 6] at MTATBTA 778.)

Plaintiffs deny that this is the complete rationale.  *See* Plaintiffs' response to Statement

No. 47.

49.     Hilary Ring also testified on behalf of defendant TBTA about the rationale

for the Resident Discounts generally:

> I think that the MTA board believes that by providing toll discounts, that it
> is removing some of the disadvantage from living in those locations which are
> suffering from a lack of connectivity to the rest of the transportation network. . . .
> These locations are not connected to the network like the rest of the city is and to
> the same extent as the rest of the city is.  And, therefore, the toll reduction is a
> way to remove some of that disadvantage.

(Herzog Decl., Ex. C [Ring Deposition Tr.] at 48-50.)

Plaintiff admits that Mr. Ring so testified and further state that he also acknowledged that

the toll discount provides an economic advantage to those receiving the discount.  Ring Tr. 50-51

("puts more money in their pockets or takes less out") (Klafter Dec., Ex. B).

50.     In his expert report, Professor Small endorsed the logic of this rationale:

> It may . . . be desirable to charge different prices to different users, if
> otherwise certain users who are "locked in" to a particular facility would have
> heavy burdens.  One way to handle this problem is to give volume discounts.
> Two approximations to volume discounts, which are simpler to administer, are
> commuter tokens and resident discounts for people living in locations with limited
> transportation options other than the facility in question.

As to the Verrazano-Narrows, Cross Bay, and Marine Parkway Bridges specifically,

Professor Small opined:

> [T]he resident discounts on [the Cross Bay and Marine Parkway] bridges,
> like the discounts on the Verrazano Bridge, make it possible for residents of the
> relatively isolated Rockaways and Broad Channel areas to have convenient access
> to the other areas of New York City.

(Herzog Decl., Ex. B [Small Report] at 17, 22.)

Plaintiffs admit that Professor Small so opined but deny that the resident discounts at

issue are "approximations of volume discounts" in that non-residents make greater use of the

Verrazano and Marine Parkway Bridges and, in the case of the Cross Bay Bridge, approximately

equal use. *See* Response to Statement No. 54, below. Plaintiffs also deny that the resident

discounts at issue are easier to administer than volume discounts available to all travelers.

Indeed, the TBTA currently affords a different EZ Pass discount to Staten Island residents

depending on volume. *See* SUF 3. Further, residents of Perth Amboy, New Jersey also lack

convenient access, other than the Verrazano Bridge, to travel to Brooklyn. *See* Small Ex. 1

(Klafter Dec., Ex. R).

51. Professor Small also observed that: "The residents of [the Rockaways,

Broad Channel, and Staten Island] are likely to take many more short trips which use [the Cross

Bay, Marine Parkway, and Verrazano-Narrows] bridges than people living in other locations,

especially in other states." (Herzog Decl., Ex. B [Small Report] at 19.)

Plaintiffs admit this Statement.

52. Professor Small calculated that more New Yorkers pay the non-discounted

tolls than out-of-staters, estimating that "nearly two-thirds of weekday tolls on the [Verrazano-

Narrows] Bridge are paid by New York State residents," while the Cross Bay Bridge and Marine

Parkway Bridge "carry many fewer people and much less goods traveling between states," as

they are "used primarily for intrastate (indeed, intracity) travel." (Herzog Decl., Ex. B [Small

Report] at 20-22; Herzog Decl., Ex. N [Jacobs Ex. 3] at MTATBTA 14319; Herzog Decl., Ex. W

[MTATBTA 14586].)

Plaintiffs admit that Professor Small calculated these amounts.

53. In 2011, roughly forty percent of the trips over the Marine Parkway

Bridge and fifty percent of the trips over the Cross Bay Bridge were taken by residents who pay

the discounted rate. (Herzog Decl., Ex. W [MTATBTA 14586].)

Plaintiffs admit this Statement.

54.     Professor Small also calculated that the Verrazano-Narrows Bridge, Cross Bay Bridge, and Marine Parkway Bridge are more heavily used by residents of Staten Island, the Rockaways, and Broad Channel than by residents of other locations.  On the Verrazano-Narrows Bridge, approximately 68% of weekday eastbound or westbound trips originate or conclude in Staten Island, while approximately 55% of weekend eastbound and 52% of weekend westbound trips originate or conclude in Staten Island.  On the Cross Bay Bridge, approximately 94% of northbound weekday trips originate in Queens; 88% for the Marine Parkway Bridge.  (Herzog Decl., Ex. B [Small Report] at 17-18; Herzog Decl., Ex. O [ Jacobs Ex. 1] at MTATBTA 9-11, 15, 18, 21;  Herzog Decl., Ex. P [Jacobs Ex. 4] at MTATBTA 13897;  Herzog Decl., Ex. Q [Jacobs Ex. 5] at MTATBTA 14035.)

Plaintiffs deny that the Verrazano-Narrows Bridge, Cross Bay Bridge, and Marine Parkway Bridge are more heavily used by residents of Staten Island, the Rockaways, and Broad Channel than by residents of other locations.  The TBTA's transaction data on which Small relies indicates that: Non-Resident usage of the Verrazano Bridge and Marine Parkway Bridge has exceeded Resident usage in every year for which the TBTA has provided data in this action (2004-2011) and has been about the same with respect to the Cross Bay Bridge.  *See* Small Ex. 5, (Klafter Dec., Ex. S).  Plaintiffs otherwise admit this Statement.

55.     Professor Moss also endorsed the logic of defendants' stated rationale for the Resident Discounts in his expert report:

> The discounts provided on [the Cross Bay Bridge, Marine Parkway Bridge, and Verrazano-Narrows Bridge] to local residents of the Rockaways and Staten Island are essentially incentives for individuals and families to live in areas that are underserved by mass transit and are in locations that are at the edge of the rest of the city.

(Herzog Decl., Ex. A [Moss Report] at 59.)

Plaintiffs admit that the Resident discounts are intended to provide economic advantages to those residing in Staten Island, the Rockaways and Broad Channel that residents of other areas do not enjoy. *See* Ring Tr. 50-51 (Klafter Dec., Ex. B).

56.   Professor Moss also observed in his report:

> Residents of the Rockaways do not have an alternate free arterial into the rest of New York City, unlike other residents of the Bronx, Queens, Brooklyn and Manhattan. . . . Residents of Broad Channel, though not geographically part of the Rockaways, are socially and economically connected to the Rockaways and rely on the Cross Bay Veterans Memorial Bridge to maintain connection to their larger community.

(Herzog Decl., Ex. A [Moss Report] at 58.)

Plaintiffs admit that Professor Moss made this observation but dispute that residents of the Rockaways lack free access into the rest of New York City. *See* Response to Statement No. 46. Plaintiffs further state that residents of Broad Channel can travel to Queens by means of the Joesph Addabo bridge, which connects Broad Channel to Queens, for which there is no toll. Ring Tr. 12 (Klafter Dec., Ex. B). Yet such residents are given a discount to travel over the Marine Parkway Bridge into Brooklyn. Ring Tr. 41 (Klafter Dec., Ex. B).

Dated:  August 23, 2013

Respectfully submitted,

By:   /s/ Seth Lesser
       Jeffrey A. Klafter
       Seth R. Lesser
       KLAFTER OLSEN & LESSER LLP
       Two International Drive, Suite 350
       Rye Brook, New York 10573
       (914) 934-9200

       -and-

       Harley J. Schnall
       LAW OFFICE OF HARLEY J. SCHNALL
       711 West End Avenue
       New York, New York 10025
       (212) 678-6546

       *Attorneys for Plaintiffs and the Class*