UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                    :

RIVA JANES, BRUCE SCHWARTZ, BETTE     :
GOLDSTEIN, and HILLEL ABRAHAM, individually and :      06 Civ. 1427 (PAE)
on behalf of all others similarly situated,        :

                                                    :      <u>OPINION & ORDER</u>
                               Plaintiffs,     :

                    -v-                 :

                                                      :

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, :
METROPOLITAN TRANSPORTATION AUTHORITY, :
JAY H. WALDER, and JAMES FERRARA,        :

                                              :

                             Defendants.   :

                                                     :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiffs Riva Janes, Bruce Schwartz, Bette Goldstein, and Hillel Abraham (collectively,

"plaintiffs"), on behalf of a class certified for injunctive purposes, bring this action against the

Triborough Bridge and Tunnel Authority ("TBTA"); the Metropolitan Transportation Authority

("MTA"); Jay H. Walder, Chairman of the MTA ("Walder"); and James Ferrara, President of the

TBTA ("Ferrara") (collectively, "defendants").  Plaintiffs allege that the defendants' differential

toll policies, which provide for discounted tolls on the Verrazano Narrows Bridge, the Cross Bay

Veterans Memorial Bridge, and the Marine Parkway-Gil Hodges Memorial Bridge that are

available only to residents of discrete areas within New York City, are unlawful.  Defendants

move for summary judgment on plaintiffs' claims.  For the reasons that follow, defendants'

motion is granted.

## I.      Factual Background[1]

### A.      Overview of the New York City Transit System

The Court begins with a brief overview of the history, purpose, and function of New

York City's transit system, which is essential to an understanding of the policies at issue here

and plays a substantial role in the Court's legal analysis.

In 1965, the New York State Legislature created the predecessor to today's MTA.  Def.

56.1 ¶ 10; Pl. Resp. to Def. 56.1 ¶ 10[2]; Herzog Decl. Ex. S ("MTA Website").  The MTA, with

its affiliates and subsidiaries, is today "North America's largest transportation network," with an

annual ridership in 2012 of 2.6 billion people.  Def. 56.1 ¶ 10; MTA Website.  The MTA's

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion—specifically, Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("Def. 56.1") (Dkt. 90); Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("Def. Resp. to Pl. 56.1") (Dkt. 98); the Declaration of Steven C. Herzog ("Herzog Decl.") (Dkt. 88) and exhibits attached thereto; the Declaration of M. Margaret Terry, Esq. ("Terry Decl.") (Dkt. 89); the Declaration of Melissa C. Monteleone and exhibits attached thereto ("Monteleone Decl.") (Dkt. 97); Plaintiffs' Statement of Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("Pl. 56.1") and Response to Defendants' Statement of Undisputed Facts ("Pl. Resp. to Def. 56.1") (Dkt. 92); and the Declaration of Jeffrey A. Klafter in Opposition to Defendants' Motion for Summary Judgment and exhibits attached thereto ("Klafter Decl.") (Dkt. 93).  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[2] In several instances such as this, Plaintiffs' Response to Defendants' Statement of Undisputed Facts does not comply with S.D.N.Y. Local Rule 56.1(c), *see supra* note 1, in that it denies or only partly admits facts asserted in Defendants' Statement of Undisputed Material Facts, supplying only a conclusory statement without citation to conflicting testimonial or documentary evidence.  The Court treats the facts asserted and substantiated by defendants as admitted.

affiliates and subsidiaries include (1) the New York City Transit Authority ("NYCTA"), an MTA affiliate which operates, *inter alia*, the subways in New York City, certain buses, and the Staten Island Railway, *see* Def. 56.1 ¶¶ 11, 13; MTA Website; (2) the Long Island Rail Road ("LIRR"), an MTA subsidiary, *see* Def. 56.1 ¶ 16; MTA Website; (3) the Metro-North Railroad ("MNR"), another MTA subsidiary, *see* Def. 56.1 ¶ 17; MTA Website; and (4) the TBTA, an MTA affiliate that oversees the operations of nine toll bridges and tunnels within New York City, including the Verrazano-Narrows Bridge (the "Verrazano" or "Verrazano Bridge"), the Marine Parkway-Gil Hodges Memorial Bridge (the "Marine Parkway Bridge"), and the Cross Bay Veterans Memorial Bridge (the "Cross Bay Bridge"), *see* Def. 56.1 ¶ 18; MTA Website.

Defendants have put before the Court two thorough and articulate reports from well-qualified and able experts, relating to the history, usage, economics and interdependence of the metropolitan area transit system. *See* Herzog Decl. Ex. A ("Expert Report of Mitchell L. Moss, Ph.D. and Related Materials" ("Moss Rep.")), Ex. B ("Expert Report of Kenneth A. Small" ("Small Rep.")).[3] Those reports have not been challenged by plaintiffs, nor have plaintiffs rebutted them with expert reports of their own. Accordingly, the Court draws upon these reports in the overview and analysis that follows.

### 1.    Public Transit

New York City's transit system as it exists today began with the construction of the city's subway system, which opened for the first time on October 27, 1904. Moss Rep. 7. Originally, two companies operated the subway system, under a "dual system" put in place in 1913: the

---

[3] Professor Moss is a professor of Urban Policy and Planning at New York University in the Wagner Graduate School of Public Service and is the Director of New York University's Rudin Center for Transportation Policy and Management. Professor Small is a research professor and Professor Emeritus of Economics at the University of California at Irvine who specializes in urban, transportation, and environmental economics.

Interborough Rapid Transit Company ("IRT") and the Brooklyn Rapid Transit Company ("BRT").[4]  *Id.* at 8.  At the time that system was completed, New York's subway system was the largest such system in the world; it "was quickly integrated into commuters' lives."  *Id.*

During the 1920s, this system suffered financially, for a variety of reasons, including the lowering of automobile prices due to mass assembly, a stagnant fare of five cents (and political opposition to raising that fare), and increased fuel costs and wages.  *Id.* at 9, 11.  Mayor John F. Hylan therefore envisioned a new subway line owned by the city but which would compete directly with the IRT and BMT and, eventually, would be able to buy out both lines, creating a unified system.  *Id.* at 10.  The new system, the Independent ("IND")—known to many as the "people's subway"—opened in 1932.  *Id.* at 10–11.  The BMT and IRT, which were neither entitled to subsidies nor able to increase the five-cent fare, responded by cutting salaries, reducing their workforce, and maintaining old equipment rather than purchasing new, in contrast to the IND's "faster, cleaner, modern subways."  *Id.*  Ridership on those lines fell significantly.  *Id.* at 11.

Concerned about the system's disrepair, Mayor Fiorello LaGuardia pressed for the unification of the subway system.  *Id.* at 11–12.  In 1939, New York City purchased the BMT for $175 million and the IRT for $151 million.  *Id.* at 12.  On June 1, 1940, New York City took control of the subways in "the largest railroad merger in US history and the largest financial transaction undertaken by the City of New York at that time."  *Id.*

In response to a drop in ridership in the late 1940s, the New York State Legislature passed legislation reorganizing the subway system and creating the NYC Transit Authority, a semi-independent public corporation run by a board of directors.  *Id.* at 13.

---

[4] The BRT became the Brooklyn-Manhattan Transit Corporation ("BMT") in 1923.

In 1965, New York State created the Metropolitan Commuter Transportation Authority, which soon became the MTA.  In 1968, the MTA began overseeing the NYC Transit Authority. *Id.*; *see supra* pp. 2–3.  From the 1960s through the early 1980s, the subway system suffered an enormous decrease in ridership:  By the early 1980s, it had declined to "levels not seen since the 1920s, before the full system was built."  *Id.* at 14.  In response, in 1979, the MTA began a rebuilding, rehabilitation, and modernization program for the system, entailing a capital investment of more than $72 billion.  *Id.*

Today, the New York City mass transit system consists of 24 subway lines and 217 bus routes.  *Id.* at 15.  Some 7.4 million people ride the subways and buses each weekday, *id.*; four of every five rush-hour commuters to New York's central business districts utilize mass transit, *id.* at 4.  The subway today is an integral part of life in New York City.

### 2.      Bridges and Tunnels

The Triborough Bridge Authority ("TBA"), chaired by Robert Moses, was created by New York State in 1933 as a public-benefit corporation, originally for the purpose of completing construction of the Triborough Bridge (since renamed the Robert F. Kennedy Bridge).  *Id.* at 25. The TBA was authorized to charge tolls, which were then used to finance construction.  *Id.*  The construction of more bridges and tunnels followed, with the goal of "complement[ing] the roads and parkways that [Moses] built, to allow regional traffic to flow well."  *Id.*

In 1940, Moses consolidated the Henry Hudson Parkway Authority, the Marine Parkway Authority, and the New York City Parkway Authority into the TBA to "centralize planning and economy and to fill in gaps in the road and bridge infrastructure."  *Id.* at 26 (citation omitted).  In 1946, the New York City Tunnel Authority was also merged into the TBA, creating the TBTA. *Id.*

New York State's transportation policies began to shift, however, in the 1960s and early 1970s, under the administration of Governor Nelson Rockefeller, moving away "from a highway-focused policy to a broader approach that emphasized maintaining and improving mass transit and intercity rail systems in addition to roads and highways." *Id.* (citation omitted); *see also Molinari v. N.Y. Triborough Bridge and Tunnel Authority*, 838 F. Supp. 718, 720 (E.D.N.Y. 1993). In 1968, when the MTA began overseeing the New York City Transit Authority, *see supra* p. 4, the TBTA became an MTA affiliate. The merger, which contemplated "far greater emphasis than ever before on mass transit," signaled that "[t]he age of Moses was over. Begun on April 23, 1924, it had ended on March 1, 1968. After forty four years of power, the power was gone at last." Robert A. Caro, <u>The Power Broker</u>, 1135, 1144 (1974). New York Public Authorities Law § 1264(1) described the new MTA as having as its purpose, "consistent with its status as ex officio board of both the New York [C]ity [T]ransit [A]uthority and the [T]riborough [B]ridge and [T]unnel [A]uthority, to develop and implement a unified mass transportation policy." N.Y. Pub. Auth. L. § 1264(1).

To that end, a system for redistributing surplus TBTA funds was put in place, and exists to this day. New York Public Authorities Law § 1219-a(2)(b), enacted in 1981, requires that $24 million plus 50% of the balance of the TBTA's operating surplus be transferred to the NYCTA, and that the remainder of the operating surplus be transferred to the MTA. *See* N.Y. Pub. Auth. L. § 1219-a(2)(b); *see also* Moss Rep. 27; *N.Y. Urban League, Inc. v. State of N.Y.*, 71 F.3d 1031, 1034 (2d Cir. 1995). The TBTA is thus a vital source of revenue helping to fund New York City's mass transit system. That system, in turn, helps "decrease[] traffic congestion on the bridges and tunnels" and "increase[s] accessibility for workers seeking to commute in and

through the MTA region . . . without adding to the traffic on the roads, bridges, and tunnels." Moss Rep. 42–43.

The TBTA bridge and tunnel tolls contribute to a decrease in congestion in more than one way. First, they provide a monetary incentive for travelers who have the option to use public transit to do so, so as to avoid toll costs. *Id.* at 43. Second, they fund major investments in mass transit infrastructure, thereby helping build and sustain a reliable and convenient mass transit system. This too encourages travelers to opt for public transit over cars. *Id.* at 44. Were there not this integrated system, more congestion on area roads, bridges, and tunnels would result, leading city commuters to experience "lost time, uncertainty of travel times, increased fuel costs, and stress"; this could, at least indirectly, "affect the quality of life of nearly every resident and business in the Downstate area." *Id.* at 43.

New York City's transit system differs fundamentally from the systems of other cities, including in the degree to which it consists of a unified, integrated system. "By having responsibility for commuter rail, toll-based bridges and tunnels, buses, and subways, the MTA serves all major modes of travel and transportation within the New York Metropolitan Region, unlike other systems which typically operate only light rail, subways, buses and/or commuter rail systems." *Id.* at 33. No other transportation agency in the United States controls toll-collecting bridges and tunnels in addition to commuter rail, buses, and subways. *Id.* As a result, the MTA is able to make "decisions . . . with respect to the subways and buses [that] also affect users of the roadways, and vice-versa." *Id.* The scale of the MTA and its receipt of funds from the TBTA's bridges and tunnels "has enabled the MTA to provide the transportation services that make possible the New York region's unique density and economic productivity." *Id.* "Without the connectivity provided by MTA bridges, tunnels, subways and commuter rail systems, New

York would not be able to maintain its place as the economic engine of the state and a center of global commerce, a position it has held for more than a century." *Id.* at 47.

### B.        The Differential Toll Policies

Under a system first put in place by the New York State Legislature, and since then adjusted administratively, individuals who are residents of Staten Island, the Rockaways, and Broad Channel receive discounts on the tolls they pay to cross their local bridges.  Def. 56.1 ¶¶ 36, 38; Pl. 56.1 ¶¶ 1–2; Herzog Decl. Ex. AA.  For residents of Staten Island, this applies to the Verrazano Bridge, which connects Staten Island to Brooklyn and serves as the only artery connecting the borough of Staten Island with the rest of New York City.  Moss Rep. 58.  For Rockaway and Broad Channel[5] residents, whose automobile access to the rest of New York City is, in a practical sense, limited to two bridges—the Marine Parkway Bridge, which connects the Rockaways to Brooklyn, and the Cross Bay Bridge, which connects the Rockaways to Broad Channel and thus, effectively, to Queens,[6] *see* Moss Rep. 58—the discount applies to those bridges.[7]

---

[5] Broad Channel is located in the Jamaica Bay between the Rockaways and Howard Beach, Queens.

[6] As noted, Broad Channel is connected to the Rockaways by the Cross Bay Bridge.  It is connected to the rest of Queens, however, by the Joseph P. Addabbo Memorial Bridge.  The residents of Broad Channel are "socially and economically connected to the Rockaways."  Moss Rep. 58.

[7] The first of these discounts, the discount on the Cross Bay Bridge toll, was implemented in 1979.  *See* Herzog Decl. Ex. C (Deposition of Hilary D. Ring, Director of Government Affairs at the MTA) ("Ring Dep."); *id.* Ex. L (Memorandum Regarding TBTA Hearing on Proposed Toll Increases).  The Staten Island Resident Discount was implemented in 1983.  *See* Klafter Decl. Ex. N (Senate Assembly Bill # 734; Legislative Materials).

### 1.    The Staten Island Resident Discount Program

Staten Island residents who use the E-ZPass system pay $6.36[8] per trip across the Verrazano.  Herzog Decl. Ex. Z.  By contrast, non-residents of Staten Island using E-ZPass pay $10.66 to cross the bridge.  *Id.*; *see also* Def. 56.1 ¶ 39.  For Staten Island residents who do not use the E-ZPass system, the token fare is $8.53; a non-resident paying cash must pay $15.  Herzog Decl. Ex. Z.  The toll for the round-trip crossing of the Verrazano is collected in the Staten Island-bound direction.  Herzog Decl. Ex. Z; *see also* Def. 56.1 ¶ 39.

### 2.   The Rockaway Resident Discount Program

For residents of the Rockaways and Broad Channel, the toll fares over both the Marine Parkway Bridge and the Cross Bay Bridge are reduced.  Def. 56.1 ¶ 36; Herzog Decl. Ex. AA.  A Rockaway or Broad Channel resident using E-ZPass pays $1.31 to cross either of those bridges and, in the case of the Cross Bay Bridge, receives a rebate for that entire sum.  Herzog Decl. Ex. Z.  A non-resident using E-ZPass, by contrast, pays $2.  *Id.*; *see also* Def. 56.1 ¶ 39.  For residents who do not use E-ZPass, a token costs $1.79; for non-residents, a token costs $2.50 or paying cash costs $3.75.  Herzog Decl. Ex. Z.

The Resident Discount Programs are summarized in the chart below:

---

[8] Residents with E-ZPass pay $6.36 for up to two trips a month across the bridge; for three or more trips per month, they pay a further reduced price of $6 per trip.

Staten Island and Rockaway Resident Discount Programs

|  | Non-Resident With E-ZPass | Non-Resident With Cash (or Tokens) | Resident With E-ZPass | Resident With Tokens |
|---|---|---|---|---|
| **Verrazano-Narrows Bridge** | $10.66 | $15.00 | $6.36 (up to two trips per month)/$6.00 (three or more trips per month) | $8.53 |
| **Marine Parkway-Gil Hodges Memorial Bridge** | $2.00 | $2.50 (with token); $3.75 (with cash) | $1.31 | $1.79 |
| **Cross Bay Veterans Memorial Bridge** | $2.00 | $2.50 (with token); $3.75 (with cash) | $1.31 (rebated entirely) | $1.79 |

### C.     The Plaintiffs

Riva Janes ("Janes") is a resident of New Jersey who, during the relevant period, regularly traveled over the Verrazano Bridge to visit her parents in Brooklyn.  Pl. 56.1 ¶ 10; Herzog Decl. Ex. H ("Janes Dep.") 41, 69–70.  During these trips, Janes frequently took her parents, who were essentially homebound, shopping for groceries, clothes, and various other items. Pl. 56.1 ¶ 10; Janes Dep. 70–76.  On occasion, on these trips, she also purchased items for herself and her son.  Janes Dep. 70–71, 79.  As a non-resident of Staten Island, Janes was not eligible for the Verrazano Bridge discount.

Bette Goldstein ("Goldstein") was a resident of New Jersey who commuted to Brooklyn over the Verrazano Bridge for her work as assistant principal and school psychologist at a yeshiva.  Pl. 56.1 ¶ 8; Herzog Decl. Ex. I ("Goldstein Dep.") 35–36, 39.  On two occasions, Goldstein also traveled from her home in New Jersey to Brooklyn to purchase food at a kosher

butcher shop.  Pl. 56.1 ¶ 8; Goldstein Dep. 47.  She, too, was ineligible for the resident discount over the Verrazano.

Hillel Abraham ("Abraham") regularly commuted over the Verrazano Bridge from his home in Elizabeth, New Jersey to his work at a yeshiva in Brooklyn.  Pl. 56.1 ¶ 9; Herzog Decl. Ex. J ("Abraham Dep.") 28, 31–33.  In addition, he regularly crossed the Marine Parkway Bridge to pick up his stepson from visits with relatives.  Pl. 56.1 ¶ 9; Abraham Dep. 45.  As a resident of neither Staten Island nor the Rockaways, he was ineligible for a discount on either bridge.

Bruce Schwartz ("Schwartz"), an accountant, is a resident of Flushing, Queens.  Pl. 56.1 ¶ 11; Herzog Decl. Ex. K. ("Schwartz Dep.") 17–19.  During the relevant period, Schwartz traveled over the Verrazano Bridge, the Cross Bay Bridge, and the Marine Parkway Bridge, for purposes of both business (*i.e.*, to visit clients) and recreation.  Schwartz Dep. 20–23, 33–36; Pl. 56.1 ¶ 11.  Although a resident of New York City, Schwartz was neither a Staten Island nor a Rockaway resident, and was thus ineligible for a discount on any of the three bridges.

## II.  Procedural History

On February 22, 2006, Schwartz and Janes filed the initial Complaint in this case.  Dkt. 1. They alleged that the TBTA's toll policies violate the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3; the Privileges and Immunities Clause,[9] U.S. Const. art. IV, § 2, cl.1; the Fourteenth Amendment's Equal Protection Clause, U.S. Const. amend. XIV § 1, cl. 3, and/or its Privileges or Immunities Clause, U.S. Const. amend. XIV § 1, cl. 2, in violation of 42 U.S.C. § 1983; and, as to New York residents, the equal protection clause of the New York

---

[9] The Privileges and Immunities Clause claim is not brought on behalf of plaintiffs who are residents of New York State.  *See* Pl. Br. 1 n.1; *United Bldg. & Constr. Trades Council of Camden Cnty. and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 217–18 (1984); *Schulz v. N.Y.S. Executive*, 960 F. Supp. 568, 577 (N.D.N.Y. 1997), *aff'd by summary order*, 162 F.3d 1148, 1998 WL 642466, at *1 (2d Cir. 1998).

State Constitution, N.Y. Const. art. I, § 11.  They also brought state-law claims of unjust enrichment and money had and received.

On March 6, 2006, the case, then assigned to the Hon. Barbara S. Jones, United States District Judge, was referred to the Hon. Henry B. Pitman, United States Magistrate Judge, for general pretrial supervision.  *See* Dkt. 6.

On April 7, 2008, Judge Pitman stayed this case pending the decision of the Second Circuit in *Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009), discussed *infra* at pp. 14–19, because there was substantial overlap between the issues presented there and in this case.  *See* Dkt. 24 (order staying case), 28 (order extending stay), 30 (order extending stay).

On June 16, 2010,[10]  plaintiffs filed the First Amended Complaint ("FAC") (Dkt. 38), adding Goldstein and Abraham as named plaintiffs.  On July 16, 2010, Defendants filed their answer to the FAC.  Dkt. 39.

On October 5, 2011, Judge Jones issued an opinion and order granting in part and denying in part plaintiffs' motion for class certification.  Dkt. 51.  The Court, pursuant to its authority under Fed. R. Civ. P. 23(c)(4), certified what it termed "an injunctive class" under Rule 23(b)(2).  This class sought solely declaratory and injunctive relief, based on plaintiffs' federal constitutional claims.  The Court then bifurcated the proceedings, pursuant to Fed. R. Civ. P. 42(b), with one phase focused on federal claims, none of which seek monetary relief, and a second phase focused on state-law damages claims.  The Court declined, for the time being, to address whether a class could properly be certified for the damages phase of the case.

On October 7, 2011, the case was reassigned to this Court.  Dkt. 52.  On October 19, 2011, defendants filed a timely motion for reconsideration of the motion for class certification,

---

[10] The Second Circuit's first decision in the *Selevan* litigation was issued October 15, 2009.  *See* 584 F.3d 82 (2d Cir. 2009).

asking the Court to deny plaintiffs' motion "to the extent that the putative class . . . include[d] persons who lack[ed] standing to seek injunctive and declaratory relief." Dkt. 53. Specifically, defendants argued that three categories of individuals included in the class under Judge Jones's opinion should be excluded from the 23(b)(2) class: (1) current residents of Staten Island, the Rockaway Peninsula, and Broad Channel; (2) persons who no longer have a driver's license or who no longer in fact drive; and (3) persons who have not crossed any of the bridges at issue within the two years preceding entry of the certification order.

On January 3, 2012, this Court granted defendants' motion for reconsideration, narrowing the Rule 23(b)(2) class so that the class boundaries were drawn to exclude persons who lacked standing to seek injunctive or declarative relief.[11] Dkt. 68.

On July 24, 2013, after the close of fact discovery and in keeping with the scheduling order entered by this Court, *see* Dkt. 85, defendants moved for summary judgment. Dkt. 86, 87 ("Def. Br."). On August 23, 2013, plaintiffs opposed that motion. Dkt. 91 ("Pl. Br."). On

---

[11] The revised class definition for the Rule 23(b)(2)/liability phase of this case was as follows:

> With regard to the First, Third, and Fourth Causes of Action in the First Amended Complaint, all users of E-ZPass who, while residing in New York, Pennsylvania, New Jersey, or Connecticut, and who, since January 17, 2000, paid tolls at the Verrazano-Narrows Bridge, the Cross Bay Veterans Memorial Bridge, or the Marine Parkway Gil Hodges Memorial Bridge without the benefit of the resident discount that has been made available by defendants for residents of specific locations in New York State. Excluded from the class are: (1) current residents of Staten Island, the Rockaway Peninsula, and Broad Channel; (2) persons who no longer have a driver's license or who are no longer living; and (3) persons who have not crossed any of the bridges at issue within the two years preceding October 5, 2011. Also excluded from the class are defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

Dkt. 68 at 10.

13

September 9, 2013, defendants submitted a reply brief in support of the motion.  Dkt. 96 ("Def. Reply Br.").

On September 24, 2013, the Court heard argument on defendants' motion and reserved decision.

### III.    Applicable Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

IV.    The *Selevan* Decisions

The Court has the benefit of unusually apposite circuit precedent to set the framework for, and guide, its analysis here.  In a series of decisions arising out of the Northern District of New York lawsuit in *Selevan v. New York Thruway Authority*, the Second Circuit has recently considered the constitutionality of residency-based toll discounts.

A.    *Selevan I*

In the *Selevan* lawsuit, brought in 2006, plaintiffs[12] challenged the constitutionality of a toll discount over the Grand Island Bridge that is available only to residents of Grand Island—an island in the Niagara River located midway between Niagara Falls, New York and Buffalo, New York.  *See Selevan v. New York Thruway Auth.* ("*Selevan I*"), 470 F. Supp. 2d 158 (N.D.N.Y. 2007).  Defendants—the New York Thruway Authority and its Chairman and Chief Executive Officer—moved to dismiss on the ground, *inter alia*, that plaintiffs lacked standing to bring the suit.

Although the district court held that plaintiffs had satisfied the requirements for Article III standing, it held that prudential standing was lacking as to the Commerce Clause claim, because plaintiffs had not demonstrated that "their use of the Grand Island Bridge, and therefore the Grand Island toll policy, [was] more than marginally within the zone of interests protected by the Commerce Clause. . . . Plaintiffs . . . d[id] not identify any in-state commercial interest that is favored, directly or indirectly, by the challenged toll policy at the expense of out-of-state competing interests."  *Id.* at 172.  Accordingly, "any alleged burden on interstate commerce [was] merely negligible."  *Id.*

---

[12] One plaintiff in that action, Robert Selevan, is plaintiff Janes' brother.  *See* Janes Dep. 78.

As to plaintiffs' claim under the Privileges and Immunities Clause, because one plaintiff (Selevan) was a citizen of New York State, and the other was a resident of Canada, the court held that they lacked standing to sue under the Privileges and Immunities Clause. *See United Bldg.*, 465 U.S. at 215–17; *cf. supra* p.11 n.9.

Finally, the district court dismissed the Equal Protection Clause claim, based on the policy's alleged discriminatory treatment of non-residents who sought to exercise their constitutional right to travel.[13]  As with the Commerce Clause claim, the district court held that plaintiffs had not adequately alleged that they had suffered "some considerable burden on *interstate* travel," *Selevan I*, 470 F. Supp. 2d at 176 (emphasis in original), and thus lacked prudential standing as to that claim.

In an alternative basis for its ruling as to the Equal Protection claim, the district court held that plaintiffs' claim would fail on the merits.  It reasoned that the Equal Protection claim was subject to rational basis review, because any burden on plaintiffs' right to interstate travel was "minimal and insufficient to constitute a deprivation," *id.* at 177, and plaintiffs had not claimed to be members of a suspect class, *id.*  And, the district court held, defendants had identified a legitimate governmental purpose for the program—namely, "the effort to ameliorate the disparate burden that would befall geographically bridge-dependent residents of Grand Island and the secondary effects of this drain on the community"; thus, the policy easily survived rational basis review.  *Id.*

---

[13] The district court held that plaintiffs had failed to assert a claim for violation of their right to travel under the Fourteenth Amendment's Privileges or Immunities Clause.  *Selevan I*, 470 F. Supp. 2d at 172 n.10.

B.      *Selevan II*

The *Selevan* plaintiffs appealed, and on October 15, 2009, the Second Circuit affirmed in part, vacated in part, and remanded.  *Selevan v. N.Y. Thruway Auth.* ("*Selevan II*"), 584 F.3d 82 (2d Cir. 2009).  It held that the plaintiffs had prudential standing:  Their Dormant Commerce Clause claims were within the "zone-of-interests" because they had sufficiently alleged that the toll affected interstate commerce.  *Id.* at 91–92 ("the zone-of-interests requirement . . . is not a rigorous one"; "[w]hether the . . . toll is actually a burden on interstate commerce is a question left for later proceedings.").

As to the merits of that claim, the Circuit held that, although plaintiffs had indeed failed to allege that the policy discriminated against interstate commerce so as to render it "virtually invalid *per se*," the district court had been required to consider whether the policy otherwise violated the Commerce Clause.  *Id.* at 95.  In particular, plaintiffs had alleged that the burden imposed on interstate commerce created by the toll was excessive in relation to the benefits conferred; the district court was therefore obliged to consider that issue before resolving the Dormant Commerce Clause claim.  *Id.* at 95–96.  It was to do so on remand, the Second Circuit stated, by applying the three-factor test articulated in *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994), to determine whether the fee imposed was reasonable.  Specifically: (1) was the toll amount based on some fair approximation of the use of the facility; (2) was it excessive in relation to the benefits conferred; and (3) did it discriminate against interstate commerce?  *Id.* at 369.  Although the pleadings had not implicated the third factor, *see* 584 F.3d at 98 n.4, the first two prongs, the Second Circuit held, required "an inquiry that is too fact-dependent to be decided upon examination of the pleadings," *id.* at 98.

As to the right to travel claim, under the Fourteenth Amendment's Equal Protection and Privileges or Immunities Clauses, the Second Circuit held, the district court had not applied the correct analysis. It had failed to consider the Privileges or Immunities claim, and had misapplied rational basis review. Instead, the Second Circuit held, the proper inquiry was, first, whether the differential policy represented an "invidious distinction[] that penalize[d] the right to travel" and thus merited strict scrutiny, or whether it instead served as "merely a minor restriction on travel that [did] not amount to the denial of a fundamental right." If the latter, the district court was to apply the test formulated in *Northwest Airlines*.[14] *Selevan II*, 584 F.3d at 102.

**C.    *Selevan III***

Following remand, the filing of a second amended complaint, and discovery, defendants moved for summary judgment. Analyzing the Dormant Commerce Clause claim, the district court applied the first two prongs of the *Northwest Airlines* test, as directed. It held that the toll structure satisfied both prongs, and granted defendants' motion for summary judgment. *Selevan v. N.Y. Thruway Auth.* ("*Selevan III*"), No. 06-cv-291 (GLS/DRH), 2011 WL 5974988, at *6 (N.D.N.Y. Nov. 28, 2011).

As to the right to travel claim, under the Fourteenth Amendment's Privileges or Immunities and Equal Protection clauses, the district court held that, even with the addition of two new plaintiffs who commuted to work via the Grand Island Bridge, the toll still constituted no more than a minor restriction on travel. *Id.* It then considered whether the toll nevertheless penalized the right to travel, and was thus subject to strict scrutiny, or was instead "designed only

---

[14] The Second Circuit affirmed the holding that Rubin, as a Canadian resident, did not have standing to sue under the Privileges and Immunities Clause of Article IV. *Selevan II*, 584 F.3d at 103. Selevan had not appealed the district court's holding, discussed *supra* at p. 16, that, as a New York resident, he could not sue under that provision. *Id.* at 88, 102 n.10.

to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance." *Id.* (citation omitted).  Finding that the toll represented a reasonable user fee, the district court held that "strict scrutiny [was] inappropriate here, and the permissibility of the . . . fee scheme hinges on the application of the *Northwest Airlines* test." *Id.*  Having already applied that test in analyzing the Dormant Commerce Clause claim and having found that the policy survived it, the district court also granted defendants' motion for summary judgment on the right to travel claim.[15]  *Id.*

> **D.    *Selevan IV***

Plaintiffs again appealed.  Per curiam, the Second Circuit held, with the district court, that the toll policy was a minor restriction on travel that constituted a reasonable user fee and did not involve "invidious distinctions."  *Selevan v. N.Y. Thruway Auth.* ("*Selevan IV*"), 711 F.3d 253, 258, 261 (2d Cir. 2013).  Accordingly, it held, the district court had correctly applied, in lieu of strict scrutiny review, the *Northwest Airlines* test to evaluate both the right to travel and the Dormant Commerce Clause claims.  *Id.* at 258.  The Second Circuit approved the district court's application of the three *Northwest Airlines* factors, and affirmed.  *Id.* at 259–61.

## V.    Plaintiff's Right to Travel Claim

> **A.    Threshold Inquiry:  Level of Scrutiny**

Guided by the Second Circuit's analyses in the *Selevan* decisions, the Court turns first to plaintiffs' right to travel claim.  "[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."  *United States v. Guest*, 383 U.S. 745, 758 (1966); *see also Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901–02 (1986); *Williams v. Town of Greenburgh*, 535 F. 3d 71, 75 (2d Cir. 2008).  Although the Supreme Court has "not felt

---

[15] Because it dismissed plaintiffs' claims, the district court denied their pending motion for class certification as moot.  *Id.* at *7.

impelled to locate this right definitively in any particular constitutional provision," *Soto-Lopez*, 476 U.S. at 902, it is "variously assigned to the Privileges and Immunities Clause of Article IV, to the Commerce Clause, and to the Privileges [or] Immunities Clause of the Fourteenth Amendment," *id.*, as well as the Equal Protection Clause of the Fourteenth Amendment, *see Zobel v. Williams*, 457 U.S. 55, 67 (1982) (Brennan, J., concurring).  This right encompasses intrastate, as well as interstate, travel.  *Selevan II*, 584 F.3d at 100; *Greenburgh*, 535 F.3d at 75; *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648–49 (2d Cir. 1971).  "A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right."  *Soto-Lopez*, 476 U.S. at 903 (citations omitted).  And "'[w]hen a local regulation infringes upon a constitutionally-protected right, we apply strict scrutiny, requiring the municipality to show that the regulation is narrowly tailored to serve a compelling governmental interest.'"  *Selevan II*, 584 F.3d at 100 (quoting *Town of Southold v. E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2009)).

Plaintiffs argue that the differential toll structure here presents a "pure case" of burdening "travel *qua* travel."  Pl. Br. 8–9.  Citing *Selevan II*, they argue that it represents a "discriminatory imposition on a fundamental right" and an "invidious distinction[] that penalize[s] the right to travel."  Pl. Br. 13 (citations omitted).

But plaintiffs misapprehend *Selevan II*.  The Second Circuit did not hold there that the fundamental right to travel is implicated, and strict scrutiny therefore applied, in every instance in which a state regulation somehow affects travel.  Instead, the Second Circuit distinguished between circumstances in which states have, for example, conditioned benefits or rights on a durational residency in the state, in which strict scrutiny is required, from state-imposed "minor

restrictions on travel." The latter, the Second Circuit stated, "simply do not amount to the denial of a fundamental right" and do not merit strict scrutiny. *Selevan II*, 584 F.3d at 101 (quoting *Town of Southold*, 477 F.3d at 54); *see also Weisshaus v. Port Auth. of N.Y. & N.J.*, 497 Fed. App'x 102, 104 (2d Cir. 2012) (summary order) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right."); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) ("[M]inor burdens impacting interstate travel, such as toll roads, do not constitute a violation of th[e] right [to travel]."). In thus synthesizing the case law, the Second Circuit was in accord with *Evansville-Vanderburgh v. Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707 (1972), in which the Supreme Court upheld, and found strict scrutiny review inapplicable to, "a charge designed only to make the user of state-provided facilities pay a reasonable fee to help defray the costs of their construction and maintenance." *Id.* at 714.

Plaintiffs here seek to distinguish this line of authority. They emphasize that cases like *Evansville-Vanderburgh* upholding fees or charges used to fund construction and maintenance as minor restrictions involved fees that applied uniformly to all users. By contrast, they note, the differential toll policy discriminates among users depending on their residence. But the same was so in *Selevan*. And the Second Circuit there ultimately upheld the decision of the district court on remand that the differential toll there represented a reasonable user fee and a minor restriction to which strict scrutiny review did not apply.

Recognizing this problem presented by *Selevan*, at argument, plaintiffs identified various ostensible distinctions between this case and *Selevan*, and offered a demonstrative handout chronicling these distinctions. *See* Court Exhibit I ("Seven Distinctions Between This Case and *Selevan II* and [*IV*]") (Dkt. 101). These, plaintiffs argued, justify applying strict scrutiny here even though it was not applied in *Selevan*.

Of plaintiffs' distinctions, only one merits extended discussion.  Plaintiffs argue that the tolls here are sufficiently larger than in *Selevan*, whether measured in absolute terms or by the differential between base and discounted fees, so as to make them "invidious" to justify strict scrutiny.  Arithmetically, plaintiffs are correct that the tolls are distinguishable.  *Selevan* involved tolls that reached a maximum of 75 cents in each direction; whereas the tolls here reach $15 for a round-trip on the Verrazano Bridge (for non-residents who do not use E-ZPass) and $2.50 each way on the Marine Parkway and Cross-Bay Bridges (same).

But these differences are not of constitutional magnitude.  First, measured in percentage rather than absolute terms, the differentials between resident and non-resident tolls here are less than those in *Selevan*:  At the point in time at which they were measured, the resident discount in *Selevan* resulted in a 66-cent (*i.e.*, 88%) resident discount on a 75-cent toll.[16]  More importantly, the tolls on the bridges here are not, in an absolute sense, so high as to constitute more than a minor burden on travel.  The Marine Parkway and Cross Bay Bridge tolls, provided that the non-resident takes advantage of the E-ZPass discount, each cost less than a single subway ride on the New York City subway system.[17]  And the size of these tolls comports with the size of the tolls at issue, and upheld, in case involving similar challenges to resident discount policies, brought in Massachusetts and Rhode Island.  *See Cohen v. Rhode Island Turnpike & Bridge Auth.*, 775 F. Supp. 2d 439 (D.R.I. 2011); *Surprenant v. Massachusetts Turnpike Auth.*, No. 09-CV-10428-

---

[16] According to the New York Thruway Authority's website, the Grand Island bridge toll is today $1 each way, but remains 9 cents for residents—*i.e.*, a 91% discount.  *See* New York State Thruway Authority: E-ZPass Discount Plans, *available at* http://www.thruway.ny.gov/ezpass/discount.html#grand.

[17] The Court here takes judicial notice, pursuant to Fed. R. Evid. 201(b), that, as of the time of this Opinion & Order, the cost of one subway ride is $2.50.  *See* MetroCard: Fares at a Glance, *available at* http://web.mta.info/nyct/fare/FaresatAGlance.htm#save.  There is also a one-time $1 fee for purchasing a MetroCard.  *Id.*

RGS, 2010 WL 785306 (D. Mass. Mar. 4, 2010); *Kelen v. Mass. Turnpike Auth.*, 22 Mass. 456,

2007 WL 1418510 (Mass. Super. Ct. May 3, 2007).  As for the Verrazano Bridge, the non-

resident charge for a roundtrip, assuming use of the E-ZPass discount, is $10.66, or just over

twice the roundtrip cost of travel on the New York subway system.  But plaintiffs have not

demonstrated that such a toll presents more than a minor restriction on travel.  And the

Verrazano is the longest suspension bridge in the United States.  A higher charge for use of such

a facility, in one of the most expensive cities in the world, is not unreasonable.  It does not shock

the conscience.

Plaintiffs point to no case, within this Circuit or beyond, in which a differential toll policy

has been held an "invidious distinction" so as to require application of strict scrutiny.  Instead, in

every case of this type, courts have held that a differential toll policy does not violate the right to

travel.  In *Cohen*, the district court, noting that the Supreme Court has upheld "bona fide

residence requirements" which "further[] the substantial state interest in assuring that services

provided for its residents are enjoyed only by residents," upheld toll discounts for residents of

Rhode Island, stating that this policy did "not burden or penalize the constitutional right of

interstate travel, for any person is free to move to a State and to establish residence there."  775

F. Supp. 2d at 451 (citations omitted).  Such requirements are distinguished from "durational,

fixed date, and fixed point residence requirements, which treat established residents differently

based on the time they migrated into the State." *Id.* (citation omitted).  The toll discount for

Rhode Island residents, it held, "plainly qualifie[d] as a 'bona fide residence requirement' under

the Supreme Court's definition," noting that "all members of the Plaintiff class are free to move

to Rhode Island and to establish residence there." *Id.*

The district court in *Surprenant* ruled likewise.  It held that the Massachusetts toll program at issue did not inhibit the plaintiff's right to travel "in any meaningful sense."  It noted that "[w]hether a burden placed by a State on a nonresident is unreasonable under the Privileges and Immunities Clause, turns on whether the challenged classification strikes at the heart of an interest deemed so fundamental that its derogation would hinder the formation, the purpose, or the development of a single Union of the states.  To constitute a penalty compromising the right to travel, a toll differential must have a significant effect on interstate travel."  2010 WL 785306, at *7 (citations omitted); *see also Kelen*, 2007 WL 1418510, at *4–5.  Surpranant, the plaintiff there, was not prevented from using the relevant bridges and tunnels; instead, like the plaintiffs here, she was "simply require[d] . . . to pay the same rate as almost all other travelers, including the overwhelming majority of [in-state] residents."  *Id.*

Similarly, here, defendants convincingly demonstrate that more New Yorkers than residents from outside the state pay the non-discounted tolls.  *See* Def. 56.1 ¶ 52, Small Rep. 20–22.  To be sure, as defendants concede, this factor alone is not dispositive.  *See* 9/24/13 H'g. Tr. 10; *see also Selevan II*, 598 F.3d at 92 ("We have never suggested that a state regulation must benefit a large percentage of the state's population in order to violate the dormant Commerce Clause.").  But plaintiffs have not shown, by any measure or metric, a significant effect on interstate travel so as to merit application of strict scrutiny or a serious basis to believe that the policy meaningfully implicates out-of-staters' fundamental right to travel.  To the contrary, the plaintiffs admitted in discovery that, for the most part, the undiscounted toll rates have not prevented them from traveling these very routes.  *See* Def. 56.1 ¶ 42 ("Of the four named plaintiffs, three have not changed their use of the Verrazano-Narrows, Cross Bay, or Marine Parkway bridges at all in light of the tolls, and the fourth has used an alternate route on

occasion."); *see also* October 5, 2011 Memorandum & Order (Dkt. 51) 4–5; Janes Dep. 44;

Goldstein Dep. 35–48; Abraham Dep. 32–40; Schwartz Dep. 33–34; 37–38.

Seeking to distinguish *Selevan* on a different ground, plaintiffs note that, unlike the

plaintiffs in *Selevan*, they bring an "equal right to earn a living claim."  But that claim is no

salvage.  Plaintiffs rely on *Hicklin v. Orbeck*, 437 U.S. 518 (1978), and *United Building*, 465

U.S. 208, which examined the Privileges and Immunities Clause in the context of a right to earn

a living claim.  Under that line of cases, the Court has held that there must be a "substantial

reason" for a difference in treatment of in-state versus out-of-state residents, and that

nonresidents "must somehow be shown to 'constitute a peculiar source of the evil at which the

statute is aimed.'"  *United Building*, 465 U.S. at 222 (quoting *Toomer v. Witsell*, 334 U.S. 385,

396 (1948)).  But as the Supreme Court has recently clarified, when it "has struck laws down as

violating the privilege of pursuing a common calling," it has done so "only when those laws

were enacted for the protectionist purposes of burdening out-of-state citizens"; in other words,

where "the clear aim of the statute at issue was to advantage in-state workers and commercial

interests at the expense of their out-of-state counterparts."  *McBurney v. Young*, 133 S. Ct. 1709,

1715 (2013).

Here, there is no credible basis for claiming that the differential toll policies at issue arose

from the impulse to protect in-state workers and commercial interests over others.  The policies

on their faces do not distinguish between in-state and out-of-state residents; instead, they benefit

only a small subset of in-state residents based on their isolated places of residence.  And the

residential discount does not apply to businesses, but only to individuals.  The differential toll

policy thus affects commercial interests only insofar as it lessens the cost of commutes for

residents who must cross the bridges to go to work, while not reducing tolls for non-residents

who must do the same.  Under *Selevan*, that is insufficient to trigger strict scrutiny.  In *Selevan IV*, in fact, the Second Circuit addressed and rejected a similar argument.  The Second Circuit noted that it "[ha]d not indicate[d] that the district court could and should apply strict scrutiny . . . if the plaintiffs included individuals who traveled the [bridge] in the course of commuting to work," because "the mere addition [to the case] of plaintiffs who pay the commuter rate did not transform a minor restriction on travel into an instance of invidious distinctions."  711 F.3d at 258.  As the Supreme Court recently explained in *McBurney*:  "While the [Privileges and Immunities] Clause forbids a state from intentionally giving its own citizens a competitive advantage in business or employment, the Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen."  130 S. Ct. at 1716. This logic, which accords with that in *Selevan,* dictates rejecting plaintiffs' argument here.[18]

  *Selevan* thus forecloses the argument that the differential toll policies here are invidious so as to mandate strict scrutiny.  To be sure, *Selevan* acknowledged the theoretical possibility that a differential toll policy could implicate the right to travel so as to merit strict scrutiny.  But plaintiffs have not pointed to features of the policies here that materially distinguish them from those at issue in *Selevan*.  The toll policy here, like the one at issue in *Selevan*, is "merely a minor restriction on travel that does not amount to the denial of a fundamental right," and

---

[18] In another attempted distinction of *Selevan*, plaintiffs note that the TBTA has admitted that it does not know the factual basis for the specific toll levels that have been set, whereas in *Selevan*, no such admission was made; the record instead was, apparently, silent on that point.  *See* Court Ex. I ¶ 2; Pl. 56.1 ¶ 15; Klafter Decl. Ex. B (Deposition of Hilary D. Ring) ("Ring Dep.") 58, 62–63.  But this fact is of no moment.  In fixing the level of scrutiny, the Court inquires whether the restriction is minor or instead involves "invidious distinctions" that may penalize the exercise of the constitutional right to travel.  And the Second Circuit, in *Selevan IV*, rejected the argument that distinctions, to be rational, must be based solely on usage:  "[W]hile . . . usage . . . might be one rational basis upon which to draw distinctions among different classes of motorists, it need not be the only one."  711 F.3d at 259 n.5 (citation omitted).

therefore must be examined, not under strict scrutiny, but under the three-factor test set out in *Northwest Airlines*. *See* 510 U.S. at 369.

       **B.**    **Second Prong: *Northwest-Airlines* Test**

Where a toll policy is deemed not to merit strict scrutiny, it should be analyzed under the *Northwest Airlines* test to determine whether the toll discriminates against interstate commerce. *See Selevan I*, 594 F.3d at 102. As noted above, that test is also part of the Commerce Clause analysis. Because, with strict scrutiny held inapplicable, the two inquiries collapse, the Court applies the *Northwest Airlines* test to the toll policies at issue here in the course of its Dormant Commerce Clause analysis, which follows.

## VI.    Plaintiffs' Dormant Commerce Clause Claim

Plaintiffs argue that the differential toll policies at issue violate the Dormant Commerce Clause, *see* U.S. Const. art. I, § 8, cl. 3. The Dormant Commerce Clause is a "doctrine inferred from the Commerce Clause" that "'restrict[s] permissible state regulation.'" *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, No. 12-707-cv, -- F.3d --, 47 (2d Cir. Aug. 14, 2013) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 326 (1979)). The Dormant Commerce Clause is animated by the "principle that one state in its dealings with another may not place itself in a position of economic isolation." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 538 (1949); *see also McBurney*, 133 S. Ct. at 1719–20 ("[The Dormant Commerce Clause] is driven by a concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (citation omitted)). Accordingly, the Dormant Commerce Clause "'prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace.'" *Selevan II*, 584 F.3d at 90 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278,

287 (1997)).  There is, however, "a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it."  Thus, "the Commerce Clause does not . . . invalidate all State restrictions on commerce."  *Selevan II*, 584 F.3d at 90 (citations omitted).  A regulation or statute instead violates the Dormant Commerce Clause if it "'(1) clearly discriminates against interstate commerce in favor of intrastate commerce, (2) imposes a burden on interstate commerce incommensurate with the local benefits secured, or (3) has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question.'"  *Id.* (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004)).

Specifically, under the three-factor *Northwest Airlines* test, the Court "asks whether the fee '(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce.'" *Selevan IV*, 711 F.3d at 259 (quoting *Northwest Airlines*, 510 U.S. at 369); *see also Selevan II*, 584 F.3d at 96, 98.  Although listed as the third factor, whether the policy discriminates against interstate commerce is the threshold inquiry; if a policy fails that prong, it is "virtually invalid *per se*." *Selevan II*, 584 F.3d at 94.  Accordingly, the Court addresses that factor first.

### A.      Discrimination Against Interstate Commerce

The Supreme Court has "interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994); *see also Selevan II*, 584 F.3d at 95.  The party challenging the validity of a state statute or regulation bears the burden of showing that it discriminates against, or places some burden on, interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).  Discrimination against

interstate commerce occurs where "an[] in-state commercial interest . . . is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005). "The 'common thread' among those cases in which the Court has found a dormant Commerce Clause violation is that 'the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation.'" *McBurney*, 130 S. Ct. at 1720 (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806 (1976)).

The toll policies at issue here, however, do not either prohibit or significantly restrict access to the New York marketplace or regulate that marketplace in a burdensome fashion. And plaintiffs fail to adduce evidence of an in-state commercial interest that is favored over an out-of-state one. To be sure, some plaintiffs here require use of the bridges to commute to work from out-of-state, and pay the non-discounted rate. But, as *Selevan* teaches, that fact is insufficient to show disadvantage to an out-of-state interest. *See supra* p. 26 (quoting *Selevan IV*, 711 F.3d at 258); *see also Selevan IV*, 711 F.3d at 261 n.8. Further, as to the plaintiffs who commute from out of state, the evidence adduced in discovery demonstrated convincingly that they have *not* been seriously affected by the tolls in place. *See* Def. 56.1 ¶ 42 ("Of the four named plaintiffs, three have not changed their use of the Verrazano-Narrows, Cross Bay, or Marine Parkway bridges at all in light of the tolls, and the fourth has used an alternate route on occasion."); *see also* October 5, 2011 Memorandum & Order (Dkt. 51) 4–5; Janes Dep. 44; Goldstein Dep. 35–48; Abraham Dep. 32–40; Schwartz Dep. 33–34; 37–38. Any burden on these plaintiffs is no more than an "incidental" burden on interstate commerce. *See McBurney*, 130 S. Ct. at 1720; *City of Phila. v. N. J.*, 437 U.S. 617, 623–24 (1978). And, apart from noting that some out-of-state commuters use the bridges to travel to work, plaintiffs have not pointed to any evidence of

commercial harm to out-of-state businesses; indeed, as noted, in-state businesses are ineligible for the discounts.  The evidence is quite to the contrary:  Defendants' experts have convincingly demonstrated that the tolls, and the distribution of toll receipts to fortify mass transit in the New York area, have had a strong overall positive impact on interstate commerce.  Plaintiffs have not factually refuted that showing.

On the summary judgment record, every indication is therefore that the tolls here do not interfere with the natural functioning of the interstate market.  "The critical consideration is the overall effect of the [regulation] on both local and interstate activity."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003).  Relevant to the inquiry as to discrimination against interstate commerce, more New Yorkers pay the undiscounted toll rates than do residents from outside the state.  *See* Small Rep. 20–22.  And the policies benefit only a small number of New York residents:  As of February 15, 2013, there were 164,001 Staten Island Resident E-Z Pass Accounts and 39,459 Staten Island Resident Sticker Accounts for the purchase of discounted tokens and carpool tickets; and as to the Rockaway Resident Discount Program, there were only 19,375 Rockaway Resident E-Z Pass Accounts and 1,851 Rockaway Resident Sticker Accounts for the purchase of discounted resident tokens.  *See* Terry Decl. ¶ 2.  *Id.*  To be sure, that in-state residents are disadvantaged by the policies along with outsiders does not foreclose a finding of discrimination against interstate commerce.  *See, e.g.*, *C & A Carbone*, 511 U.S. at 391; *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 n.4 (1951); *Selevan II*, 598 F.3d at 92; *see also supra* pp. 23–24.  But it supplies a valuable gauge of the policies' overall effect, and strongly undermines any claim that they are driven by "economic protectionism."  *See Nichols Media Grp., LLC v. Town of Babylon*, 365 F. Supp. 2d 295, 314–15 (E.D.N.Y. 2005); *cf. C & A*

*Carbone*, 511 U.S. at 404 (O'Connor, J., concurring) ("[T]he fact that interests within the regulating jurisdiction are equally affected by the challenged enactment counsels against a finding of discrimination. . . . The existence of substantial in-state interests harmed by a regulation is a powerful safeguard against legislative discrimination." (citation omitted)).

Finally, the benign purpose underlying the challenged policies is apparent. The policies are self-evidently motivated by a desire to reduce the burden suffered by geographically isolated New York residents, who have little or no practical access to mass transit. *See* Ring Dep. 48–50; Klafter Decl. Ex. M (legislative materials); Monteleone Decl. Ex. DD. Plaintiffs do not dispute that such was the intention underlying the policy. They instead dispute that instituting differential toll policies, even for such purposes, is constitutionally permissible, dubbing it, "aid[ing the] home team." Pl. Br. 24; *see also* 9/24/13 H'g Tr. 49; Ct. Ex. I ¶ 5. But the Supreme Court teaches that, in this area, benign purposes are germane. "The crucial inquiry . . . must be directed to determining whether [the policy] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Phila. v. N.J.*, 437 U.S. at 624. On these grounds, in fact, the Supreme Court recently upheld a statute that distinguished between residents and nonresidents that "ha[d] a distinctly nonprotectionist aim." *McBurney*, 130 S. Ct. at 1719, 1716.

Plaintiffs rely on cases holding statutes or regulations to violate the Dormant Commerce Clause. *See, e.g.*, *C & A Carbone*, 511 U.S. at 390–95; *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality of State of Oregon*, 511 U.S. 93, 99–100 (1994); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–73 (1984). But these cases are very far afield. Here, there is no local business, industry, or monopoly that the toll discounts could credibly be viewed as designed to promote or protect—or as even having the unintended effect of bolstering. The discounts instead

31

bespeak an attempt by New York State to alleviate unique geographic burdens affecting a small subset of the community. That is a legitimate and non-discriminatory governmental purpose.

*C&A Carbone*, which both parties address, supplies a revealing contrast. Plaintiffs there challenged as a violation of the Dormant Commerce Clause an ordinance adopted by the town of Clarkstown, New York, which required all solid waste to be processed at a designated transfer station before leaving the municipality. 511 U.S. at 386. As the town admitted, the purpose of the requirement was to offset the cost of the construction and maintenance of the transfer station itself. *See id.* at 386, 394. The Supreme Court held that the Clarkstown ordinance discriminated against interstate commerce, because it "deprived [out-of-staters] of access to local demand for their services" and "squelche[d] competition in the waste-processing service . . . , leaving no room for investment from outside." *Id.* at 392.

The toll policy here is altogether different. It does not protect or elevate a local business, let alone do so at the expense of out-of-staters. It does not limit out-of-staters' access to any in-state market. That commuters from out of state may have to pay more than select geographically challenged in-state residents to travel to work does not disfavor out-of-state interests. Indeed, it is far from clear why such a policy would benefit an in-state business. If anything, a toll policy that lowers tolls for outbound, but not incoming, commuters might tend to harm local businesses competing for talented employees and customers.

The differential toll policies thus clear the threshold inquiry presented by the third prong of the *Northwest Airlines* test. The Court therefore turns to the first and second prongs, which address the reasonableness of these policies.

> **B.      Fair Approximation of Use**

This first prong of the *Northwest Airlines* test inquires whether the fee imposed is based on some fair approximation of use of the facilities.  It does not require a "perfect fit"; "it simply requires reasonableness."  *Selevan I*, 584 F.3d at 98.

Defendants have amassed an impressive record demonstrating that the tolls for using the Verrazano, Marine Parkway, and Cross Bay bridges are based upon a fair approximation of the use of those facilities.  The toll discounts are provided to residents of remote geographical areas who must use these bridges frequently, for shorter trips, and who have limited or no other mass transit connections to the rest of the city.  *See* Moss Rep. 58–59; Small Rep. 17 ("It may . . . be desirable to charge different prices to different users, if otherwise certain users who are 'locked in' to a particular facility would have heavy burdens.  One way to handle this problem is to give volume discounts.  Two approximations to volume discounts, which are simpler to administer, are commuter tokens and resident discounts for people living in locations with limited transportation options other than the facility in question."); Ring Dep. 45–50, 60, 94.  The statistics supplied by defendants' experts, which plaintiffs do not dispute, reflect these usage patterns:

> For eastbound trips on weekdays [over the Verrazano-Narrows Bridge], approximately 68% originate in Staten Island; on weekends, it is about 55%.  For westbound trips, 68% on weekdays and 52% on weekends had Staten Island as their final destination.  Similarly, on the Cross Bay Bridge, about 94% of northbound weekday trips originated in Queens (presumably Rockaway), and for the Marine Parkway Bridge the corresponding fraction is 88%.

Small Rep. 17–18.

Disputing that the tolls reflect a fair approximation of use, plaintiffs note that the TBTA is unaware of any analysis undertaken at the time the current toll policies were adopted to justify setting the specific amount of the discounts.  They also argue that nonresidents are charged

unduly more than residents for use of these bridges.  Pl. Br. 19.  But the requirement of a "fair approximation" seeks reasonableness and broad proportionality.  It does not require precise tailoring, or a pre-enactment administrative record, for toll amounts to be justified.  And the tolls at issue here are not confiscatory.  As the statistics related by defendants' experts reflect, they fairly approximate usage patterns on the bridges.

Plaintiffs also take issue with the proposition that "those who use the bridge more . . . [should] pay less," *id*.  But these policy views aside, under the Dormant Commerce Clause, it is reasonable, and consistent with the requirement of a fair approximation of usage, to enact a differential toll policy where doing so creates "incentives for individuals and families to live in areas that are underserved by mass transit and are in locations that are at the edge of the rest of the city," Moss Rep. 59, and alleviates the burdens on frequent users, Small Rep. 17.  Plaintiffs have not demonstrated that, as a matter of logic or fact, adopting a differential toll policy for these purposes is unreasonable.[19]

There is no material issue of fact bearing on whether the toll discounts represent a "fair approximation of use."  On the undisputed facts, they do, and are eminently reasonable.  The first prong of the *Northwest Airlines* test is, therefore, met.

### C.    Undiscounted Toll in Relation to the Benefits Conferred

Defendants have adduced evidence that compellingly establishes the second *Northwest Airlines* prong—that the toll not be excessive in relation to the benefits conferred.  Defendants' expert reports persuasively demonstrate that the tolls charged for use of the TBTA bridges, used to strengthen the city's mass transit system, confer vast benefits enjoyed by all users of New

---

[19] At argument, in fact, plaintiffs appeared to abandon their argument that the tolls do not reflect a "fair approximation" of use.  In response to the Court's question why the tolls do not reflect a fair approximation of use, plaintiffs' counsel responded:  "I'm not sure I would challenge that." *See* 9/24/13 H'g. Tr. 54.

York City's integrated transportation system.  These include attracting industry; attracting and retaining a talented workforce; attaining economic productivity; and providing "redundancy and resilience" for the region in the event of disasters and crises (as demonstrated recently during the events of Hurricane Sandy, *see* Herzog Decl. Ex. G (Report by Professor Moss entitled "Superstorm Sandy and the Metropolitan Transportation Authority")).  Moss Rep. 46–53, 60–61; *see also* Small Rep. 1 ("[T]he economic benefits to users of these bridges are large, widely dispersed, and of a magnitude comparable to or greater than the tolls charged."), 18 ("Everyone who makes use of the goods and services provided within the region, whether by public or private agencies, benefits from the concentration of activity that is made possible by the transportation system. . . . Thus, given its integrated nature, everyone benefits from each part of the system because the reduction of mass transit service (or of the ability to travel on the roadways) would affect the entire region's ability to serve the needs of its residents, businesses, workers, and visitors. . . . [E]ven a commuter who does not use a subway may still benefit from it because it enables his or her workplace to more easily attract other workers, clients, or customers.").

The Second Circuit has held, as to this prong, that there must be a "functional relationship" between a fee or toll and those who pay it.  *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009) (while holding that a ferry toll did not bear a close enough functional relationship to the benefits conferred on its passengers, stating that "a user fee . . . may reasonably support the budget of a governmental unit that operates facilities that bear at least a 'functional relationship' to facilities used by the fee payers"); *cf. Automobile Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 887 F.2d 417, 422 (2d Cir. 1989) (finding a close "functional relationship" between the PATH train and the Port

35

Authority's bridges and tunnels, noting that PATH "benefits the entire interstate transportation network because the effects of eliminating PATH would extend all the way north to the George Washington Bridge and all the way south to each of the Staten Island bridges"); *Molinari*, 838 F. Supp. at 726–27 ("Those who pay the tolls on the Verrazano–Narrows Bridge benefit from the subways, buses and the commuter rail lines because, without those facilities, it would become increasingly more difficult, if not impossible, for them to commute once they crossed the Narrows."). Such a functional relationship is easily shown here. Defendants have impressively demonstrated the value of mass transit in reducing congestion on bridges and tunnels throughout New York City. That benefit is enjoyed especially by commuters to and from locations where mass transit options also exist, providing an alternative option to those particular arteries for commuters and thus decreasing the traffic thereon. But, as defendants' experts have shown, it benefits all commuters, including because those commuters eventually reach portions of the city that are served, and benefited by, a smoothly functioning mass transit system. *See Molinari*, 838 F. Supp. at 726 (rejecting argument that, because mass transit did not provide an alternative to use of the Verrazano Bridge, it did not contribute to reducing bridge congestion).

Plaintiffs do not factually dispute any of this. Nor do they dispute that under the second prong of the *Northwest Airlines* test, it is fair to consider the benefits that flow from the tolls charged on TBTA bridges on the entire transportation system within the New York City area. *See* 9/24/13 H'g. Tr. (The Court: "What you're saying is that in concept in assessing the benefits conferred one can look at the benefits conferred on the nonresident that flow from fortifying the integrated system, correct?" Mr. Lesser: "Correct.").

Instead, plaintiffs appear to argue that, for the differential tolls to be valid, there must be a disproportionate, or outsized, benefit received by those who pay the higher fee. *See* Pl Br. 19

("Any benefits motorists enjoy from lower road and highway congestion due to a strong mass transit system are enjoyed by TBTA facility users and non-users alike, so an analysis under the prong linking those unquantifiable indirect benefits with TBTA tolls is not valid.").  But plaintiffs offer no legal support for the notion that, for a fee or toll to be valid under the second *Northwest Airlines* prong, its benefits must redound lopsidedly to those who pay that fee or toll. Rather, it is enough that such persons benefit in fair relation to the fees or tolls they pay.  Here, the undisputed evidence shows, emphatically, that they do.

The differential toll policies in question, therefore, satisfy all three prongs of the *Northwest Airlines* test.  The Court, accordingly, rejects plaintiffs' claim that these policies violate the Dormant Commerce Clause, or infringe plaintiffs' right to travel.

## VII.   New York State Constitution and State Law Claims

Plaintiffs also bring claims under the New York State Constitution, and state common law claims for unjust enrichment and money had and received.

Plaintiffs concede that "the New York State law claims . . . are derivative of the federal claims."  Pl. Br. 1 n.1.[20]  Indeed, Article I, Section 11 of the New York State Constitution, which provides for "equal protection of [the] laws," is coextensive with the Equal Protection Clause of the United States Constitution.  *See Town of Southold*, 477 F.3d at 52 n.3.  Because the Court has held that the toll policies do not violate the right to travel—including as embodied in the Equal Protection Clause of the United States Constitution—it follows that the equal protection clause

---

[20] Plaintiffs cite one case in which the New York Court of Appeals struck down a tax scheme as unconstitutional under the federal Constitution but declined to reach the claim under the New York State Constitution.  *See City of N.Y. v. State of N.Y.*, 94 N.Y.2d 577, 592 n.5 (2000).  But that case does not refute that claims under state constitutions are generally derivative of their federal counterparts.  It merely stated that the plaintiffs there "fail[ed] to demonstrate how in this case that provision provides greater protection than its Federal counterpart."  *Id.*

of New York State's Constitution is also unoffended by these same policies. *See id.* ("Because the Equal Protection Clauses of the federal and New York Constitutions are coextensive, our analysis responds to [right to travel] claims under each of these provisions."); *see also Selevan III*, 2011 WL 5974988, at *6 n.7. Similarly, both the unjust enrichment and money had and received claims are premised on a finding that the practices are unconstitutional or unlawful. The Court has held to the contrary. The Court also grants summary judgment for the defendants as to plaintiffs' state law claims.[21]

## CONCLUSION

For the foregoing reasons, the Court rejects plaintiffs' claims that the Rockaway and Staten Island Resident Discount toll policies are unconstitutional, and enters summary judgment in favor of defendants on all claims. The Clerk of Court is directed to terminate the motion pending at docket number 86, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: October 16, 2013
       New York, New York

---

[21] The Court here exercises jurisdiction over plaintiffs' state law claims pursuant to the grant of supplemental jurisdiction in 28 U.S.C. § 1367 over state law claims that "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Where a district court has dismissed all claims over which it has original jurisdiction, it is to balance the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to use its discretion to exercise supplemental jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Because plaintiffs' state-law claims are derivative of their federal claims, those factors counsel in favor of exercising supplemental jurisdiction here.